**GOLDMAN, SACHS & CO., Plaintiff,**

v.

**GOLDEN EMPIRE SCHOOLS FINANCING AUTHORITY and Kern High School District, Defendants.**

No. 12 Civ. 4558(RJS).

United States District Court, S.D. New York.

Feb. 8, 2013.

Esqs., of Sullivan & Cromwell, LLP, New York, NY, for Plaintiff.

James L. Kauffman and Peter J. Mougey, Esqs., Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, P.A, Pensacola, FL; James Richard Swanson, Jason W. Burge, and Joseph C Peiffer, Esqs., Fishman Haygood Phelps Walmsley Willis & Swanson, LLP, New Orleans, LA; Kevin Joseph Madonna, Esq., Kennedy & Madonna, LLP, Hurley, NY, for Defendants.

## MEMORANDUM AND ORDER

### RICHARD J. SULLIVAN, District Judge:

From 2004 to 2007, Defendants Golden Empire Schools Financing Authority and Kern High School District (collectively, "Golden Empire") issued approximately $125 million of complex securities to fund projects, employing Plaintiff Goldman, Sachs & Co. ("Goldman") as the sole underwriter and broker. In 2012, Golden Empire initiated an arbitration before the Financial Industry Regulatory Authority ("FINRA") to settle disputes arising from that relationship. Before the Court is Goldman's motion to preliminarily enjoin that arbitration. For the reasons that follow, the Court grants Goldman's motion.

### I. BACKGROUND[1]

In July 2004, Golden Empire, a public financing authority in Bakersfield, California, elected to issue approximately $95 million of bonds to refinance prior debt and to acquire and build new educational facilities. (Compl. ¶ 13; Defs.' Opp'n 2.) In time, Golden Empire approached Goldman about underwriting the debt, whereupon Goldman advised Golden Empire on the desirability of issuing the debt in the form of auction rate securities ("ARS"), which offered long-term liquidity at lower, short-term interest rates that would be reset at public auctions. (Compl. ¶ 13; Defs.' Opp'n 2–4.) Specifically:

> ARS are long-term bonds and stocks whose interest rates or dividend yields are periodically reset through auction. At each auction, holders and buyers of the securities specify the minimum interest rate at which they want to hold or buy. If buy/hold orders meet or exceed sell orders, the auction succeeds. If supply exceeds demand, however, the auction fails and the issuer is forced to pay a higher rate of interest in order to penalize it and to increase investor demand.

*Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 335 (2d Cir.2011).

Ultimately, Golden Empire retained Goldman as the sole underwriter and broker-dealer for the issue. As such, two contracts governed the relationship between the parties: an underwriter agreement setting forth Goldman's duty to purchase and offer the bonds (the "2004 Underwriter Agreement"), and a separate but contemporaneously executed broker-dealer agreement that outlined Goldman's obligations in the management of the auction and bids (the "2004 Broker–Dealer Agreement"). (Compl. ¶¶ 13–14.)

With respect to the resolution of disputes arising between the parties, the 2004 Underwriter Agreement is silent, stating only that the agreement is subject to "the laws of the State [of California]." (*Id.* Ex. 5 ¶ 15.) However, the 2004 Broker–Dealer Agreement contains a forum selection

---

1. The facts are taken from the Complaint ("Compl."). In ruling on the instant motion, the Court has also considered Plaintiff's memorandum of law ("Pl.'s Mem."); Defendants' opposition brief ("Defs.' Opp'n"); Plaintiff's reply brief ("Pl.'s Reply"); and the declarations and exhibits attached thereto.

clause (the "Forum Selection Clause" or "Clause") providing that:

> The parties agree that all actions and proceedings arising out of this Broker–Dealer Agreement or any of the transactions contemplated hereby shall be brought in the United States District Court in the County of New York and that, in connection with any such action or proceeding, submit to the jurisdiction of, and venue in, such court.

(*Id.* ¶ 15–16; *see id.* Ex. 2 ¶ 5.9.) The 2004 Broker–Dealer Agreement also contains a merger clause providing that:

> This Broker–Dealer Agreement, and the other agreements and instruments executed and delivered in connection with the issuance of the [ ]ARS, contain the entire agreement between the parties relating to the subject matter hereof, and there are no other representations, endorsements, promises, agreements or understandings ... between the parties relating to the subject matter hereof.

(*Id.* ¶ 18; *see id.* Ex. 2 ¶ 5.4.) The parties entered into identical contracts in 2006 and 2007 (collectively, the "Underwriter Agreements" and "Broker–Dealer Agreements"), when Golden Empire issued ARS in the amounts of $20 million and $10 million, respectively, using Goldman as the sole underwriter and broker-dealer. (*Id.* ¶¶ 19–30.)

In 2008, the ARS market collapsed. *See UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.,* 660 F.3d 643, 646 (2d Cir. 2011). As a result, Golden Empire's ARS auctions failed, triggering higher interest rates on the debt and, eventually, requiring Golden Empire to refinance. (Defs.' Opp'n 6.) On February 11, 2012, Golden Empire filed a Statement of Claim against Goldman before FINRA, pursuant to FINRA Rule § 12200, which states that FINRA members and their customers "must arbitrate a dispute ... [i]f arbitration ...

is ... [r]equested by the customer; [t]he dispute is between a customer and a [FINRA] member ...; and [t]he dispute arises in connection with the business activities of the member...." (Compl. ¶ 31; Decl. of James R. Swanson, dated Sept. 5, 2012, Ex. A.) In its Statement of Claim, Golden Empire argued, *inter alia,* that Goldman fraudulently induced it to issue ARS by failing to disclose both Goldman's higher fees on ARS as well as its practice of placing "cover bids" at ARS auctions. (Compl. Ex. 1, ¶¶ 1–2.) That is, when serving as a broker-dealer, Goldman often placed support bids to "prop up" ARS auctions to prevent their failure. (*Id.*) Allegedly, once Goldman ended this practice in 2008, auctions failed and the market collapsed, precipitating Golden Empire's losses. (*Id.* Ex. 1, ¶ 4.) Had Golden Empire been aware of this scheme, it claims, it would have chosen another vehicle for its debt. (*Id.* Ex. 1, ¶ 28.)

On June 11, 2012, Goldman brought suit in this Court pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, seeking declaratory relief and preliminary and permanent injunctions against the arbitration under the Forum Selection Clauses in the parties' Broker–Dealer Agreements. (*Id.* ¶¶ 36–46.) Goldman filed the instant motion for a preliminary injunction on August 8, 2012. (Doc. No. 26.) Golden Empire filed its opposition brief on September 5, 2012 (Doc. No. 29), and Goldman replied on September 25, 2012 (Doc. No. 32). Defendants submitted supplemental authority on December 3, 2012, and Plaintiff replied on December 5, 2012. (Doc. Nos. 35, 37.) The Court heard oral argument on January 11, 2013. On January 15, 2013, Plaintiff wrote the Court to clarify a point made at oral argument. (Doc. No. 37.) Defendants responded that same day. (Doc. No. 37.) Finally, Plaintiff submitted additional supplemental au-

thority on January 23, 2013, and Defendants responded the next day. (Doc. Nos. 36, 37.)

## II. LEGAL STANDARD

 A preliminary injunction is an "extraordinary remedy." *Winter v. Natural Res. Def. Council,* 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). In the Second Circuit, a plaintiff seeking a preliminary injunction must establish: "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 35 (2d Cir.2010). The party seeking the injunction carries the burden of persuasion to demonstrate "by a clear showing" that the necessary elements are satisfied. *See Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997).

## III. DISCUSSION

The parties do not dispute that Goldman will suffer irreparable harm if it is improperly forced to arbitrate. (*See* Defs.' Opp'n 8); *see also Merrill Lynch Inv. Managers v. Optibase, Ltd.,* 337 F.3d 125, 129 (2d Cir.2003) (holding that irreparable harm occurs where a movant is "forced to expend time and resources arbitrating an issue that is not arbitrable"). Rather, Golden Empire contests the likelihood of Goldman's success on the merits and the balance of the hardships. The Court addresses each argument in turn.

## A. Likelihood of Success on the Merits

 The Federal Arbitration Act evinces a strong federal policy favoring arbitration. *See* 9 U.S.C. § 1 *et seq.; Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). However, it is undisputed that an agreement to arbitrate "is a matter of contract[,] and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *see also Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC,* 450 F.3d 100, 104 (2d Cir. 2006). Whether an agreement to arbitrate exists is a question of state contract law. *Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co., Ltd.,* 189 F.3d 289, 295 (2d Cir.1999). In New York, "a written agreement that is complete, clear[,] and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records, Inc.,* 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 780 N.E.2d 166 (2002).

Thus, if the plain meaning of the Forum Selection Clause in the Broker–Dealer Agreements is to limit disputes to the Southern District of New York—thereby overriding the arbitration agreement in FINRA Rule § 12200—Goldman likely will prevail. Golden Empire argues against this result for three reasons. First, Golden Empire claims that, under Second Circuit precedent, the parties' Forum Selection Clause is insufficiently explicit to override the prior arbitration agreement in FINRA Rule § 12200 and should therefore be read to preserve the agreement. (Defs.' Opp'n 8–9.) Second, Golden Empire contends that the phrase "action or proceeding" in the Clause does not encompass arbitration and instead applies only to judicial proceedings. (*Id.* 10–13.) Finally, Golden Empire asserts that, even if the Clause bars arbitration of disputes arising out of the Broker–Dealer Agreements, it does not bar arbitration of claims grounded in the Underwriter Agreements because the two contracts are

distinct. (*See* Defs.' Opp'n 21.) The Court concludes that each of these arguments fails for the reasons set forth below.

### 1. Specificity and Meaning of the Forum Selection Clause

■ In determining whether an agreement to arbitrate has been supplanted by a later accord, courts in the Second Circuit look to whether the subsequent agreement "specifically preclude[s]" or provides "positive assurance" that a dispute is no longer subject to arbitration. *Applied Energetics, Inc. v. NewOak Capital Markets, LLC,* 645 F.3d 522, 525 (2d Cir.2011); *Bank Julius Baer & Co., Ltd. v. Waxfield Ltd.,* 424 F.3d 278, 284 (2d Cir.2005). Two Second Circuit decisions are instructive. In *Bank Julius,* the court considered whether a broad agreement to arbitrate "any dispute" was overridden by a later-executed forum selection clause that waived objections to jurisdiction in New York, but did not mention arbitration. 424 F.3d at 282. Citing the forum selection clause's failure to mention arbitration, the court held that it could not "say that the . . . [c]lause, which does not even mention arbitration, either 'specifically precludes' arbitration or contains a 'positive assurance' that this dispute is not governed by the [a]rbitration [a]greement." *Id.* at 284. Instead, citing the presumption in favor of arbitration, the court directed that the agreements be read to complement each other, with the former requiring arbitration and the latter permitting enforcement of arbitral awards in New York courts. *Id.*

In *Applied Energetics,* the Second Circuit considered an expansive agreement to arbitrate "any dispute." 645 F.3d at 523. However, in contrast to *Bank Julius,* the subsequent agreement broadly provided that "[a]ny dispute arising out of this [a]greement shall be adjudicated in the Supreme Court, New York County or in the federal district court for the Southern District of New York." *Id.* Rejecting the district court's reliance on *Bank Julius* to harmonize the agreements, the Second Circuit ruled that the parties had "revoke[d the] earlier agreement to arbitrate by executing a subsequent agreement the terms of which plainly preclude arbitration." *Id.* at 525. Pointing to the breadth of the subsequent agreement ("[a]ny dispute"), its mandatory nature ("shall"), and its reference to judicial action ("adjudicate"), the Second Circuit held that the parties' later agreement "specifically preclude[d]" arbitration, despite its failure to explicitly use the term. *Id.* at 526; *see also Biremis, Corp. v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* No. 11 Civ. 4934(LDW), 2012 WL 760564, at *5 (E.D.N.Y. Mar. 8, 2012) (finding that agreement granting "exclusive jurisdiction" to federal and state courts for "all disputes" waived earlier agreement to arbitrate before FINRA). The court additionally rejected the district court's reliance on the presumption in favor of arbitration to settle the claim, instructing that the presumption applies only when the *scope* of an agreement to arbitrate is in question, not the *existence* of the agreement itself. *Applied Energetics,* 645 F.3d at 526; *accord Biremis,* 2012 WL 760564, at *5.

■ Golden Empire cites *Bank Julius* for the propositions that the Forum Selection Clause at issue is insufficiently "explicit" to supplant the FINRA arbitration agreement, and that, regardless, the presumption in favor of arbitration requires that the Clause and FINRA arbitration agreement be read to complement each other. (Defs.' Opp'n 17, 19–20.) However, *Applied Energetics* bars both of these arguments. First, as the Second Circuit made clear in *Applied Energetics,* a forum selection clause need not explicitly contradict an arbitration agreement to trump it;

instead, it may simply substantively exclude it. 645 F.3d at 525; *Spanski Enters., Inc. v. Telewizja Polska, S.A.*, No. 07 Civ. 930(GEL), 2007 WL 1187870, at *5 (S.D.N.Y. Apr. 23, 2007) ("[A]lthough the [f]orum [s]election [c]lause does not explicitly use the word 'arbitration,' it need not, as its plain and unambiguous terms nevertheless 'specifically preclude[ ]' the disputed arbitration."). Further, relying on the presumption in favor of arbitration to force a complementary reading that conflicts with the plain meaning of a forum selection clause directly contradicts *Applied Energetics. See Applied Energetics*, 645 F.3d at 526 ("[W]hile doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made.").

To bolster its arguments, Golden Empire looks beyond Second Circuit precedent to two district court cases and a Fourth Circuit opinion that addressed clauses identical to the Clause at issue but permitted arbitration to proceed. The first district court case, *Goldman, Sachs & Co. v. City of Reno*, denied an injunction on the cursory analysis that an identical clause "d[id] not touch upon arbitration or arbitrability directly" and therefore controlled only the forum of a court action. No. 12 Civ. 327(RCJ), 2012 WL 5944966, at *4 (D.Nev. Nov. 26, 2012). The second, *UBS Fin. Services Inc. v. Carilion Clinic*, denied a motion to enjoin arbitration on the grounds that the clause was "susceptible to an interpretation favoring arbitration" and that, without an explicit waiver, the presumption in favor of arbitration required a complementary reading. 880 F.Supp.2d 724, 732 (E.D.Va.2012). In affirming *Carilion Clinic*, the Fourth Circuit held that "it would never cross a reader's mind that the clause provides that the right to FINRA arbitration was being su-

perseded or waived. No word even suggesting supersedence, waiver, or preclusion exists in the sentence." *UBS Fin. Services, Inc. v. Carilion Clinic*, 706 F.3d 319, 330 (4th Cir.2013). However, as discussed, the Second Circuit has rejected the need for explicit waiver contemplated by each of these rulings. *Applied Energetics*, 645 F.3d at 525–26. Thus, unless the plain meanings of FINRA Rule § 12200 and Forum Selection Clause can be harmonized, the latter must trump the former. The Court concludes that they cannot.

■ The Forum Selection Clause provides that "*all* actions and proceedings ... shall be brought in the United States District Court in the County of New York." Golden Empire struggles to argue that "all actions and proceedings" should be read to refer only to *judicial* proceedings while permitting arbitration to proceed before FINRA. (See Defs.' Opp'n 19–20.) To support its cause, Golden Empire marshals a variety of arguments for the proposition that "all actions and proceedings" cannot be read to encompass arbitration. As discussed below, the Court finds each to be patently unavailing and inconsistent with Second Circuit precedent.

a. New York Civil Practice Law and Rules and the Federal Rules of Civil Procedure

Golden Empire cites the language of the federal and state civil rules as evidence that "actions" and "proceedings" may refer only to judicial disputes. *See* N.Y. C.P.L.R. § 103 (defining civil judicial disputes as "actions" or "special proceedings"); N.Y. C.P.L.R. § 304 ("An action is commenced by filing a summons and complaint or summons with notice.... A special proceeding is commenced by filing a petition...."); Fed.R.Civ.P. 1 ("These rules govern the procedure in all civil ac-

tions and proceedings in the United States district courts . . . ."). Because these civil rules do not explicitly include arbitration in the discussion of judicial disputes, Golden Empire argues, the Clause cannot be read to include arbitration.

However, that argument strains reason. As an initial matter, Federal Rule of Civil Procedure 1 presupposes the application of the Rules to actions and proceedings in federal courts. It plainly does not claim to limit other types of actions or proceedings. Similarly, while N.Y. C.P.L.R. sections 103 and 304 likewise contemplate "actions" or "proceedings" in the civil judicial context, the Forum Selection Clause negotiated between Golden Empire and Goldman makes no mention of the C.P.L.R. and suggests no such limitation. Indeed, it is instructive, but hardly surprising, that the United States Supreme Court, Second Circuit, and New York State courts routinely refer to arbitrations as "actions" or "proceedings." *See, e.g., 14 Penn Plaza LLC v. Pyett,* 556 U.S. 247, 269, 129 S.Ct. 1456, 173 L.Ed.2d 398 (2009) (discussing an "arbitral body conducting a *proceeding*" (emphasis added)); *Citigroup Global Mkts., Inc.,* 598 F.3d at 32 ("VCG began arbitration *proceedings* against CGMI before the FINRA pursuant to FINRA Rule [§ ] 12200." (emphasis added)); *City of New York v. Uniformed Fire Officers Ass'n, Local 854,* 263 A.D.2d 3, 699 N.Y.S.2d 355, 357 (App.Div. 1999) ("Normally, a party to a valid arbitration agreement is required to submit to arbitration and to defer any challenge to the *proceeding* until an award is rendered . . . ." (emphasis added)). Moreover, Golden Empire itself referred to its FINRA arbitration as an "action" and "proceeding"

in its Statement of Claim (*see* Compl. Ex. 120–21 (requesting that after "due *proceedings*" Golden Empire be awarded the "costs of prosecuting this action" (emphasis added))), and the FINRA rules also refer to arbitrations as proceedings (*see* FINRA Rule § 12208 ("At any stage of an arbitration *proceeding* held in a United States hearing location, all parties shall have the right to be represented by an attorney." (emphasis added))). Considered in context, Golden Empire's arguments amount to little more than a linguistic trick and are thus easily dismissed.

b. Waiver of the Right to a Jury and Substitution of "Arbitration" in the Forum Selection Clause

For the first time at oral argument, Golden Empire argued that the Clause's waiver of the right to a jury trial, as well as the illogical result of substituting "arbitration" for "actions and proceedings" in the Clause cut in favor of limiting the Clause's application to judicial disputes. Both arguments may be dispatched with ease.[2] As to the first of these arguments, the Clause merely states the obvious, that certain "actions and proceedings" would allow for jury trials, and then clarifies that the jury right is forfeited in those instances. (*See* Tr. 17:20–25.) For the second argument, an analogous substitution of "actions in the Supreme Court of New York" would be equally illogical since actions in Supreme Court cannot be brought in the Southern District. Nevertheless, it can hardly be argued that such a dispute would fall outside the heading of "actions and proceedings." (*See* Tr. 19:6–9.) Thus,

2. Golden Empire argues that the substitution would render the sentence illogical because arbitrations do not occur in court. For example, "[t]he parties agree that all [*arbitrations* ] arising out of this Broker–Dealer Agreement or any of the transactions contemplated hereby shall be brought in the United States District Court in the County of New York and that, in connection with any such [*arbitration* ], submit to the jurisdiction of, and venue in, such court."

Golden Empire's arguments are once again unavailing.

c. Scope of the Forum Selection Clauses in *Applied Energetics* and *Biremis*

Finally, Golden Empire argues that the Clause at issue is narrower than those covering "any dispute" in *Applied Energetics* and *Biremis*. Thus, Golden Empire asserts that the Clause should be read to cover only judicial disputes—that is, suits to compel arbitration, those to enforce arbitral awards, and suits brought by Goldman—as FINRA Rule § 12200 permits only customers and not members to demand arbitration. (Tr. 22:11–15.) However, this argument is unpersuasive. Simply put, the fact that the language at issue in *Applied Energetics* and *Biremis*—"any dispute"—indisputably encompasses arbitration does not mean that the language utilized here—"actions and proceedings"—cannot. Instead, this Court will follow the lead of the Supreme Court, the Second Circuit, New York State courts, Golden Empire itself, and the FINRA Rules to conclude that the phrase "actions and proceedings," by its plain terms, encompasses arbitration, and that any effort to limit the Clause to judicial disputes must strain to avoid that meaning.

\* \* \*

Accordingly, as in *Applied Energetics*, the breadth of the Forum Selection Clause ("all actions and proceedings"), its mandatory nature ("shall"), and its plain reference to judicial action ("the United States District Court in the County of New York"), must be given full effect. Because the Clause and FINRA arbitration agreement are therefore "all-inclusive, ... mandatory, and neither admits the possibility of the other," *Applied Energetics*, 645 F.3d at 525, the Court concludes that the latter Broker–Dealer Agreements trump FINRA Rule § 12200, and that the parties' disputes must be heard in the first instance by a court in this district.

2. Application of the Forum Selection Clause to the Instant Dispute

█ Golden Empire finally claims that, even if the Forum Selection Clause requires that disputes arising out of the Broker–Dealer Agreements must be heard by the Southern District, those arising out of the Underwriter Agreements may proceed before FINRA. (Defs.' Opp'n 13–17.) This argument fails on two independent grounds. First, the Broker–Dealer Agreements contain broad merger clauses referencing "the other agreements and instruments executed and delivered in connection with the issuance of the [ ]ARS" and stating that the Broker–Dealer Agreements "contain the entire agreement between the parties relating to the subject matter hereof, and there are no other representations, endorsements, promises, agreements[,] or understandings ... between the parties relating to the subject matter hereof." (Compl. ¶ 18); *see Applied Energetics*, 645 F.3d at 525–26 & n. 2 (finding that an identical merger clause displaced the arbitration clause in a prior agreement).

Second, Golden Empire's claims are inextricably linked to the Broker–Dealer Agreements and cannot escape application of the Forum Selection Clause. Though Golden Empire argues that its breach of fiduciary duty, fraud, and negligent misrepresentation claims arise solely out of the Underwriter Agreements (Defs.' Opp'n 21–22), even a cursory review of the Statement of Claim reveals that assertion to be false. Golden Empire's FINRA action hinges on Goldman's placement of "cover bids" to support ARS auctions in its role as broker-dealer. Specifically, Golden Empire recites in its Statement of Claim that its action for breach of fiduciary duty arises, in part, from "the extent to which

[Goldman's] cover bid practice created and manipulated the market for ARS generally," "disguis[ing] the lack of natural demand for ARS." (Compl. Ex. 1 at 16). Similarly, the fraud claim states that had Golden Empire "known that the ARS market was wholly dependent on Goldman's support bids and that if broker-dealers like Goldman ceased its [*sic*] support bidding policy the market would collapse," Golden Empire would have sought an alternative vehicle for its debt. (*Id.* Ex. 1 at 17.) Finally, Golden Empire's negligent misrepresentation claim declares that Goldman had a duty to disclose "the extent of its involvement in propping up the ARS market." (*Id.* Ex. 1 at 18.) Thus, the Court concludes that the entirety of Golden Empire's dispute with Goldman arises from the Broker–Dealer Agreements and is subject to the Forum Selection Clauses limiting jurisdiction to the Southern District.

\* \* \*

As Goldman has demonstrated the applicability of the Forum Selection Clauses to the instant dispute, the Court determines that Goldman is likely to succeed on the merits of its action for declaratory and permanent injunctive relief.

### B. The Balance of Hardships and the Public Interest

"[T]he balance of hardships inquiry asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided." *Tradescape.com v. Shivaram,* 77 F.Supp.2d 408, 411 (S.D.N.Y.1999). Devoting precious little space to its argument, Golden Empire asserts that it would suffer greater harm because an injunction would deprive it of a "speedy and inexpensive" resolution of its claims. (Defs.' Opp'n 24.) The Court disagrees. First, Golden Empire waited four years from its alleged injury—stemming from the 2008 ARS market collapse—to bring its claim, undercutting any argument for haste. Second, the arbitration has been stayed since its initiation in February 2012. An injunction will simply maintain the status quo and permit the parties to pursue discovery and/or dispositive motions. Third, because Golden Empire and Goldman contracted to settle their disputes in the Southern District, denying an injunction would grant Golden Empire a windfall in the form of its preferred forum while forcing Goldman to "expend time and resources arbitrating an issue that is not arbitrable." *See Merrill Lynch Inv. Managers,* 337 F.3d at 129. Accordingly, the Court finds that the equities tip decidedly in favor of Goldman.

Golden Empire argues against this conclusion by citing the federal policy favoring arbitration, claiming that a preliminary injunction would not be in the public interest. (Defs.' Opp'n 25.) However, as discussed above, that policy applies only where parties have contracted to arbitrate—and they have not done so here. Instead, the Court concludes that it is in the public's interest to enforce the parties' contract as executed—with an agreement to bring disputes in the Southern District. Thus, the Court finds that granting a preliminary injunction is in the public interest.

\* \* \*

Accordingly, because Goldman has demonstrated that it "is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest," *Winter,* 555 U.S. at 20, 129 S.Ct. 365, the Court grants Goldman's motion for a preliminary injunction.

### IV. Conclusion

For the reasons stated above, the Court finds that Goldman has demonstrated by a

"clear showing" that it has satisfied the elements under the Second Circuit's test for a preliminary injunction. Accordingly, Plaintiffs' motion is GRANTED.

IT IS HEREBY ORDERED that, no later than February 28, 2013, the parties shall submit a joint letter outlining the next contemplated steps in this case, as well as a joint proposed case management plan and scheduling order. A template can be found at http://nysd.uscourts.gov/cases/show.php?db=judge—info&id=347.

SO ORDERED