OPINION
BYBEE, Circuit Judge:
In 2005 and 2006, the City of Reno issued approximately $211 million in complex securities and employed Goldman, Sachs & Co. (“Goldman”) as its sole underwriter and broker-dealer. Years after Reno’s financing collapsed, Reno initiated an arbitration before the Financial Industry Regulatory Authority (“FINRA”) to resolve its claims against Goldman arising out of their contractual relationship. Goldman then filed this action to enjoin the FINRA arbitration, arguing that (1) Reno was not a “customer” entitled to arbitrate under FINRA Rule 12200 and (2), at any rate, Reno had disclaimed any right to arbitrate by agreeing to forum selection clauses in the contracts between the parties. Reno responded that FINRA had the right in the first instance to determine *736 arbitrability. The district court agreed with Reno and disagreed with Goldman. It therefore denied Goldman’s motion for injunctive relief and entered final judgment in favor of Reno.
We have little difficulty determining that Reno was Goldman’s “customer” under the FINRA Rules. However, the second question — whether the forum selection clauses superseded Goldman’s obligation to arbitrate under FINRA Rule 12200 — has been the subject of litigation in multiple circuits, with decidedly mixed results. The Fourth Circuit and the District of Minnesota have held that an identical forum selection clause does not supersede a FINRA member’s obligation to arbitrate under the FINRA Rules, see UBS Fin. Servs., Inc. v. Carilion Clinic, 706 F.3d 319 (4th Cir.2013); UBS Sec. LLC v. Allina Health Sys., No. 12-2090, 2013 WL 500373 (D.Minn. Feb. 11, 2013), while two judges within the Southern District of New York have held that materially identical forum selection clauses trump FINRA Rule 12200 such that the customer must bring its claims in federal court, see Goldman, Sachs & Co v. N.C. Mun. Power Agency No. One, No. 13-CV-1319, 2013 WL 6409348, at *7 (S.D.N.Y. Dec. 9, 2013); Goldman, Sachs & Co. v. Golden Empire Schools Fin. Auth., 922 F.Supp.2d 435 (S.D.N.Y.2013). Because we find that the forum selection clauses in the parties’ contracts superseded any right to FINRA arbitration, we reverse the district court’s order and final judgment, and remand for further proceedings consistent with this opinion.
I. BACKGROUND
In 2005, Reno undertook a series of city projects. To finance these projects, Reno chose to issue municipal bonds. Reno approached Goldman to discuss financing options, and Goldman advised Reno to issue the debt in the form of auction rate securities (“ARS”).
ARS are long-term, variable-rate instruments with interest rates that reset at periodic auctions. At each auction, ARS investors submit a bid setting forth the number of ARS that they wish to purchase, hold, or sell, and the lowest interest rate that they will accept. The lowest interest rate at which the entire issue can be sold at par establishes the new interest rate to be paid until the next auction. This new interest rate is known as the “clearing rate.” If there are insufficient bids to cover the bonds available for sale at the auction, however, the auction “fails,” and the interest rate is set at a contractual “maximum rate” until the next auction.
With Goldman’s assistance, Reno issued $73.45 million in ARS in October 2005 (the “2005 Bonds”). At that time, Reno and Goldman entered into two written agreements that governed their relationship: (1) an underwriter agreement that outlined Goldman’s duty to purchase and offer the 2005 Bonds (the “2005 Underwriter Agreement”) and (2) a separate, but contemporaneously executed, broker-dealer agreement that outlined Goldman’s duty to manage the auctions for the 2005 Bonds (the “2005 Broker-Dealer Agreement”). The contracts were entered into after arm’s-length negotiations in which both parties were represented by counsel.
For purposes of our analysis, the 2005 Broker-Dealer Agreement contains two significant clauses. First, it contains a forum selection clause providing that:
The parties agree that all actions and proceedings arising out of this Broker-Dealer Agreement or any of the transactions contemplated hereby shall be brought in the United States District Court for the District of Nevada and that, in connection with any such action or proceeding, the parties shall submit *737 to the jurisdiction of, and venue in, such court.
Second, the 2005 Broker-Dealer Agreement contains a merger clause providing that:
This Broker-Dealer Agreement, and the other agreements and instruments executed and delivered in connection with the issuance of the ARS, contain the entire agreement between the parties relating to the subject matter hereof, and there are no other representations, endorsements, promises, agreements or understandings, oral, written or inferred, between the parties relating to the subject matter hereof.
Reno and Goldman entered into substantially identical contracts in 2006 (the “2006 Underwriter Agreement” and the “2006 Broker-Dealer Agreement”) when Reno financed a new city project by issuing $187.43 million in ARS (the “2006 Bonds”).
Reno compensated Goldman for its services under each of these four agreements. Pursuant to the 2005 and 2006 Underwriter Agreements, Goldman received an underwriter’s discount by purchasing the 2005 and 2006 Bonds for less than their face value. In addition, pursuant to the 2005 and 2006 Broker-Dealer Agreements, Goldman received annual broker-dealer fees in exchange for its management of the ARS auctions.
In 2008, the ARS market collapsed, and Reno’s ARS auctions began to fail. As a result, Reno was forced to refinance the 2005 and 2006 Bonds at considerable cost. According to Reno, these costs should be attributed to Goldman’s conduct. Specifically, Reno alleges that, where Goldman served as underwriter, it had a general practice of placing support bids in ARS auctions to ensure that these auctions did not fail; that Goldman did not disclose this general practice to Reno before Reno issued the 2005 and 2006 Bonds; that, consistent with Goldman’s general practice, it placed support bids in Reno’s ARS auctions until 2008; that Goldman’s decision to stop placing support bids in 2008 caused Reno’s ARS auctions to fail; and that, if Goldman had told Reno about this general practice, Reno would not have issued ARS to finance its city projects. Based on these allegations, Reno claims that Goldman’s conduct breached its fiduciary duty, amounted to fraud and negligent misrepresentation, violated the Securities Exchange Act of 1934, violated the Nevada Securities Act, and violated Municipal Securities Rulemaking Board and FINRA Rules.
In order to resolve these claims through arbitration, Reno filed a Statement of Claim against Goldman before FINRA on February 10, 2012. FINRA is a self-regulatory organization that has “the authority to exercise comprehensive oversight over ‘all securities firms that do business with the public.’ ” UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc., 660 F.3d 643, 648 (2d Cir.2011) (quoting 72 Fed.Reg. 42169, 42170 (Aug. 1, 2007)). To exercise this oversight, FINRA has instituted rules with which its members, including Goldman, agree to comply. See FINRA Bylaws, art. IV, § 1(a). And one of these rules provides that FINRA members and their customers “must arbitrate a dispute ... [i]f [arbitration ... [is] [Requested by the customer; [t]he dispute is between a customer and a member ...; and [t]he dispute arises in connéction with the business activities of the member.... ” FINRA Rule 12200.
In response to Reno’s Statement of Claim, Goldman filed this action in the United States District Court for the District of Nevada, seeking a declaratory judgment that FINRA lacks jurisdiction over the dispute and an injunction against the arbitration proceedings. In Goldman’s motion for preliminary injunction, filed *738 shortly after its complaint, Goldman argued that Reno was not a “customer” entitled to arbitrate under FINRA Rule 12200 and that, at any rate, Reno had disclaimed any right to arbitrate by agreeing to the forum selection clauses in the 2005 and 2006 Broker-Dealer Agreements.
The district court denied Goldman’s motion for preliminary injunction. Goldman, Sachs & Co. v. City of Reno, No. 3:12-CV-00327, 2012 WL 5944966 (D.Nev. Nov. 26, 2012). In so doing, the district court reached three legal conclusions that are at issue on appeal. First, the district court found that FINRA had jurisdiction to decide the arbitrability of Reno’s claims. Second, the district court determined that Reno was a “customer” under FINRA Rule 12200. And third, the district court found that the forum selection clauses in the 2005 and 2006 Broker-Dealer Agreements did not supersede Reno’s right to FINRA arbitration. Accordingly, the district court ruled that Goldman was not likely to succeed on the merits.
Following the district court’s ruling, the parties agreed that there was nothing further to litigate, and the district court entered final judgment in favor of Reno. Goldman then filed this appeal.
II. STANDARD OF REVIEW
In order to obtain a preliminary injunction, Goldman must demonstrate that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).
We review the district court’s denial of a preliminary injunction for an abuse of discretion, its factual findings for clear error, and its conclusions of law de novo. See Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1157 (9th Cir.2007).
III. DISCUSSION
There are three issues on appeal. First, we address whether FINRA must determine the arbitrability of this matter in the first instance. Because we conclude that we, rather than FINRA, have jurisdiction to determine arbitrability, we reach the remaining two issues. Second, we consider whether Reno was a “customer” of Goldman, giving it the right to invoke arbitration under the FINRA Rules. Third, we examine whether Reno and Goldman contracted around FINRA Rule 12200 through forum selection clauses and agreed to litigate any claims in the United States District Court for the District of Nevada.
A. Jurisdiction to determine arbitrability
Both the arbitrability of the merits of a dispute and the question of who has the primary power to decide arbitrability depend on the agreement of the parties. See First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). “But, unlike the arbi-trability of claims in general, whether the court or the arbitrator decides arbitrability is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise.” Oracle Am., Inc. v. Myriad Group A. G., 724 F.3d 1069, 1072 (9th Cir.2013) (internal quotation marks and citations omitted). Thus, “there is a presumption that courts will decide which issues are arbitrable.” Id.
The district court concluded that, because Goldman is a FINRA member, it has agreed to FINRA arbitration on the issue of arbitrability itself. As support for this conclusion, the district court relied on *739 FINRA Rule 12203(a), which states that “[t]he Director may decline to permit the use of the FINRA arbitration forum if the Director determines that ... the subject matter of the dispute is inappropriate, or that accepting the matter would pose a risk to the health or safety of arbitrators, staff, or parties or their representatives.”
This legal conclusion was incorrect. FINRA Rule 12203(a) does not provide “clear and unmistakable” evidence that FINRA members like Goldman have consented to FINRA determination of the issue of arbitrability. Instead, FINRA Rule 12203(a) simply describes certain circumstances under which the FINRA Director may deny access to the FINRA arbitration forum. Furthermore, neither the underwriter nor the broker-dealer agreements provide “clear and unmistakable” evidence that the parties intended that FINRA would determine the issue of arbitrability. The presumption that the court will decide which issues are arbitra-ble remains unrebutted, and we must make the call.
B. Reno as Goldman’s “Customer ”
“[AJrbitration is a matter of contract,” Rent-A-Center, W., Inc. v. Jackson, 561 U.S. 63, 130 S.Ct. 2772, 2776, 177 L.Ed.2d 403 (2010), and there is “a liberal federal policy favoring arbitration agreements.” [1] Moses H. Cone Mem’l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). “In line with these principles, courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms.” AT & T Mobility LLC v. Concepcion, — U.S.-, 131 S.Ct. 1740, 1745, 179 L.Ed.2d 742 (2011) (internal citations omitted).
Here, the relevant arbitration provision is FINRA Rule 12200, which requires FINRA members like Goldman to arbitrate disputes arising out of their business activities at the request of a “customer.” Goldman denies any obligation to arbitrate under this rule because Reno was not a “customer” as that term is used in the FINRA Rules.
The FINRA Rules define “customer” only in the negative: “A customer shall not include a broker or dealer.” FINRA Rule 12100(f). This definition does not tell us what a “customer” is, and because Reno is neither a broker nor a dealer, the FINRA Rules’ definition, standing alone, cannot tell us whether Reno fits the bill.
Goldman argues that Reno was not a “customer” because their relationship did not relate directly to investment or brokerage services. As support for this narrow definition; Goldman cites the Eighth Circuit’s decision in Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc., 264 F.3d 770 (8th Cir.2001). In Fleet Boston, the court considered whether “a ‘customer’ is *740 everyone who is not a broker or dealer.” Id. at 772. Rejecting this broad definition, the court explained that “the [FINRA] Rules were [not] meant to apply to every sort of financial service a [FINRA] member might provide, regardless of how remote that service might be from the investing or brokerage activities; which [FINRA] oversees.” Id. The court then held that “[FINRA] Rules support a general definition of ‘customer’ as one who receives investment and brokerage services or otherwise deals more directly with securities than what occurred here.” Id. (emphasis added). Although the court said it was a “close call,” the Eighth Circuit held that where the purported customer “only received financial advice,” it did not qualify as a “customer” entitled to arbitration. Id. at 773.
Other circuits have refined the definition of “customer” in the years following Fleet Boston. See Carilion Clinic, 706 F.3d at 325; W. Va. Univ. Hosps., Inc., 660 F.3d at 651. In Carilion Clinic, UBS and Citigroup sought to enjoin arbitration under the FINRA Rules, contending .that Cari-lion Clinic was not- a “customer.” 706 F.3d at 321. The Fourth Circuit rejected this contention. In so doing, the court looked to other provisions of the FINRA Rules to provide context for- the definition of “customer.” Id. at 324-35. Specifically, the court noted that FINRA Rule 12200 provides that arbitrable disputes must arise in connection with the “business activities” of the FINRA Member, suggesting that a person must be a customer of a FINRA member’s business activities to obtain arbitration; that FINRA Rule 12100(r) suggests that the business activities of a FIN-RA member involve “investment banking or securities business”; and that FINRA’s mission, among other things, is “[t]o promote through cooperative effort the investment banking and securities business, to standardize its principles and practices, to promote therein high standards of commercial honor, and to encourage and promote among members observance of federal and state securities laws.” Restated Certificate of Incorporation of Financial Industry Regulatory Authority, Inc. § 3 (July 2, 2010).
Subject to the scope indicated by the FINRA Rules, however, the court reasoned that “the term ‘customer’ in Rule 12200 still retains its generally accepted meaning — ‘one that purchases a commodity or service.’ ” Carilion Clinic, 706 F.3d at 325 (quoting Merriam Webster’s Collegiate Dictionary 308 (11th ed.2007)). The court concluded that á “customer” is “one, not a broker or dealer, who purchases commodities or services from a FINRA member in the course of the member’s business activities insofar as those activities are covered by FINRA’s regulation, namely the activities of investment banking and the securities business.” Id; see also W. Va. Univ. Hosps., Inc., 660 F.3d at 650. Thus, because UBS and Citigroup had provided a variety of services to Cari-lion Clinic in connection with the issuance of ARS bonds, Carilion Clinic was their “customer.” Carilion Clinic, 706 F.3d at 327-28.
Similarly, in UBS Financial Services, Inc. v. West Virginia University Hospitals, West Virginia University Hospitals (“WVUH”) issued $329 million in bonds, a portion of which were issued as ARS. 660 F.3d at 645. UBS served as “both the lead underwriter and the main broker-dealer responsible for facilitating the Dutch auctions in which WVUH’s bonds were resold and their interest rates set.” Id. Like Reno and Goldman, WVUH and UBS entered into underwriter and broker-dealer agreements. UBS facilitated the auctions, for which it was paid a fee, and was permitted to purchase the ARS at a discount rate. Id. The Second Circuit con- *741 eluded that “[t]he term ‘customer’ includes at least a non-broker or non-dealer who purchases, or undertakes to purchase, a good or service from a FINRA member.” Id. at 650. On that basis, “WVUH was UBS’s customer because WVUH purchased a service, ■ specifically auction services, from UBS.” Id.
We find the Second and Fourth Circuits’ analysis persuasive. Accordingly, we conclude that a “customer” is a non-broker and non-dealer who purchases commodities or services from a FINRA member in the course of the member’s FINRA-regulated business activities, i.e., the member’s investment banking and securities business activities.
With this definition in mind, we find that Reno easily qualifies as Goldman’s “customer.” To finance a series of city projects, Reno issued approximately $211 million in ARS bonds. Pursuant to the 2005 and 2006 Underwriter and Broker-Dealer Agreements, Goldman served as the underwriter for the 2005 and 2006 Bonds and as the broker-dealer for the ARS auctions; sold Reno interest rate swaps to protect the financing structure; acted as Reno’s agent in dealing with the rating agencies; conducted discussions with bond insurers on Reno’s behalf; and provided monitoring and advisory services for the 2005 and 2006 Bonds and the interest rate swaps. Goldman provided these services in the course of its securities business activities, and Reno compensated Goldman in the form of underwriter’s discounts and annual broker-dealer fees. Accordingly, under both the 2005 and 2006 Underwriter and Broker-Dealer Agreements, Reno was Goldman’s “customer.” And because Goldman’s customer has requested arbitration, FINRA Rule 12200 requires Goldman to arbitrate unless Reno has disclaimed its right to arbitrate through contract.
C. Forum Selection Clauses
Goldman argues that, even if Reno is its customer, Goldman may enjoin the ongoing FINRA arbitration because Reno disclaimed its right to arbitrate by agreeing to the forum selection clauses in the 2005 and 2006 Broker-Dealer Agreements. These forum selection clauses recite that “all actions and proceedings ... shall be brought in the ... District of Nevada.” As a threshold matter, we agree with Goldman that a contract between the parties can supersede the default obligation to arbitrate under the FINRA Rules. See, e.g., Carilion Clinic, 706 F.3d at 328; Applied Energetics, Inc. v. New-Oak Capital Markets, LLC, 645 F.3d 522, 525 (2d Cir.2011). The question, then, is whether the forum selection clauses at issue here sufficiently demonstrate the parties’ intent to do so. We conclude that they do. Goldman had a default obligation to arbitrate with its customers under the FINRA Rules, but Goldman was free to maké alternative arrangements with each individual customer when the parties formed or modified their contractual relationship. Here, at the time the contracts were negotiated, Goldman and Reno agreed to forum selection clauses which clearly indicate that the parties never agreed to arbitrate claims arising out of their contractual relationship. Instead, from the beginning of this relationship, Gbldman and Reno agreed to bring such claims in the District of Nevada. We therefore hold that these forum selection clauses superseded Goldman’s default obligation to arbitrate under the FINRA Rules.
1. Legal Standards
The Supreme Court has emphasized that the “first principle” of its arbitration decisions is that “[a]rbitration is strictly a matter of consent and thus is a *742 way to resolve those disputes — but only those disputes — that the parties have agreed to submit to arbitration.” Granite Rock Co. v. Int’l Bhd. of Teamsters, 561 U.S. 287, 130 S.Ct. 2847, 2857, 177 L.Ed.2d 567 (2010) (internal quotation marks and citations omitted). When determining whether parties have agreed to submit to arbitration, “we apply ‘general state-law principles of contract interpretation, while giving due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration.’ ” Mundi v. Union Sec. Life Ins. Co., 555 F.3d 1042, 1044 (9th Cir.2009) (quoting Wagner v. Stratton Oakmont, Inc., 83 F.3d 1046, 1049 (9th Cir.1996)). This policy, however, “is merely an acknowledgment of the FAA’s commitment to ‘overrule the judiciary’s longstanding refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts.’ ” Granite Rock, 130 S.Ct. at 2859 (emphasis added) (quoting Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989)). Accordingly, the Supreme Court “[has] never held that this policy overrides the principle that a court may submit to arbitration ‘only those disputes ... that the parties have agreed to submit.’ Nor [has the Court] held that courts may use policy considerations as a substitute for party agreement.” Id. (citations omitted) (quoting First Options of Chi., 514 U.S. at 943, 115 S.Ct. 1920).
Guided by this first principle, we do not apply the so called “presumption in favor of arbitrability” in every case. Where the arbitrability of a dispute is contested, we must decide whether the parties are contesting the existence or the scope of an arbitration agreement. If the parties contest the existence of an arbitration agreement, the presumption in favor of arbitrability does not apply. If the parties contest the scope of an arbitration agreement, we must determine whether the scope of the agreement covers the relevant dispute. The presumption in favor of arbitrability applies only where the scope of the agreement is ambiguous as to the dispute at hand, and we adhere to the presumption and order arbitration only where the presumption is not rebutted. Granite Rock, 130 S.Ct. at 2858-60; AT & T Techs., Inc. v. Commc’ns Workers of Am., 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (“[W]here the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.” (internal quotation marks, brackets, and citation omitted)); Mundi, 555 F.3d at 1044-45 (“The presumption in favor of arbitration ... does not apply if contractual language is plain that arbitration of a particular controversy is not within the scope of the arbitration provision.” (internal quotation marks and citation omitted)); Bank Julius Baer & Co. v. Waxfield Ltd., 424 F.3d 278, 281 (2d Cir.2005).
Consistent with this analytical framework, we must decide whether Goldman contests the existence or scope of a valid arbitration agreement. Goldman and Reno did not include an express arbitration clause in the Underwriter or Broker-Dealer Agreements. Instead, as a FINRA member, Goldman had a default obligation to arbitrate at the request of a “customer.” And as a “customer,” Reno stood to benefit from this default obligation, provided that the parties did not contract around it. According to Goldman, however, that is precisely what occurred when the parties agreed to the forum selection clauses: *743 Reno disclaimed any right to arbitrate that it might otherwise have had. If Goldman is correct that the forum selection clauses superseded its default obligation under the FINRA Rules, Goldman and Reno agreed not to arbitrate any claims that might arise out of their contractual relationship at the very time this relationship was formed. Goldman thus contests the existence, rather than the scope, of an arbitration agreement, and, therefore, the presumption in favor of arbitrability does not apply in this case.
The Second Circuit reached the same conclusion on similar facts in Applied Energetics, 645 F.3d at 526. There, the parties included an arbitration clause in an “Engagement Agreement.” That clause, however, was allegedly superseded by a forum selection clause in a subsequent “Placement Agreement.” Id. at 523. The court noted that “while doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made.” Id. at 526. Consequently, because the question of whether the Placement Agreement had superseded the Engagement Agreement was a dispute over the existence, rather than the scope, of the agreement to arbitrate, “the presumption in favor of arbitrability [did] not apply.” Id.
Because we likewise conclude that the presumption in favor of arbitrability does not apply here, we use general state-law principles of contract interpretation to decide whether a contractual obligation to arbitrate exists, see Mundi, 555 F.3d at 1044: If the parties’ agreement is clear on its face, we must enforce it as written. See Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 750 N.Y.S.2d 565, 780 N.E.2d 166, 170 (2002) (“[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.”); accord Canfora v. Coast Hotels & Casinos, Inc., 121 Nev. 771, 121 P.3d 599, 603 (2005) (“[W]hen a contract is clear on its face, it will be construed from the written language and enforced as written.” (internal quotation marks and citation omitted)). Accordingly, to avoid arbitration, the forum selection clauses to which Goldman and Reno agreed need only be “sufficiently specific to impute to the contracting parties the reasonable expectation that they are superseding, displacing, or waiving the arbitration obligation created by FINRA Rule 12200.” Carilion Clinic, 706 F.3d at 328.
2. Application
With this standard in mind, we turn to the text of the forum selection clauses and conclude that Reno has clearly and unambiguously disclaimed any right it might otherwise have had to FINRA arbitration. As previously mentioned, the forum selection clauses provide that “all actions and proceedings ... shall be brought in the ... District of Nevada.” Reno argues that the phrase “all actions and proceedings” refers only to judicial proceedings and is not incompatible with Reno enforcing its rights under FINRA Rule 12200.
We are not writing on a blank slate. Although the precise question is new in our court, it has been the subject of litigation in federal courts around the country. The Fourth Circuit and the District of Minnesota have held that the phrase “all actions and proceedings” is in fact limited to judicial proceedings, see Carilion Clinic, 706 F.3d at 329-30; Allina Health Sys., 2013 WL 500373, at *6, while the Southern District of New York has held that the very same phrase, “by its plain terms, encompasses arbitration,” Golden Empire, 922 F.Supp.2d at 443; see also N.C. Mun. *744 Power Agency, 2013 WL 6409348, at *6.[2] We have benefitted from the thoughtful opinions of these courts and recognize that the question is a close one. For the reasons that follow, we agree with the Southern District of New York that the parties have agreed to resolve their contractual disputes in federal court in Nevada.
First, noting that the forum selection clauses make no reference to arbitration, Reno argues that if Goldman had intended to contract out of its duty to arbitrate, it could have and should have included an express waiver of arbitration in the parties’ agreements. While this certainly would be an easier case if the parties had included an express waiver, we know of no requirement that they do so. Rather, because the presumption in favor of arbitra-bility does not apply here, the forum selection clauses need only be sufficiently specific to impute to the contracting parties the reasonable expectation that they would litigate any disputes in federal court, thereby superseding Goldman’s default obligation to arbitrate under FINRA Rule 12200. See Applied Energetics, 645 F.3d at 525-26. Thus, although an express waiver might be preferable, we decline to impose formal incantations when applying general state-law principles of contract interpretation. But see Carilion Clinic, 706 F.3d at 329 (“[O]ne would reasonably expect that a clause designed to supersede, displace, or waive arbitration would mention arbitration.”).
Second, Reno points out that the forum selection clauses require only that “actions and proceedings” be brought in federal court in Nevada. Reno contends that the New York Civil Practice Laws and Rules[3] (“N.Y. C.P.L.R.”) do not consider arbitra-tions to be “actions” or “proceedings” and that, as a result, the forum selection clauses do not encompass arbitration. See N.Y. C.P.L.R. § 103 (defining civil judicial disputes as “actions” or “special proceedings”); id. § 304 (“An action is commenced by filing a summons and complaint or summons with notice_A special proceeding is commenced by filing a petition .... ”). In Goldman, Sachs & Co. v. Golden Empire Schools Financing Authority, the Southern District of New York found that this argument “strains reason,” noting that “the Forum Selection Clause negotiated between [the ARS issuer] and Goldman makes no mention of the C.P.L.R. and suggests no such limitation.” 922 F.Supp.2d at 442. The same is true here; there is no evidence the parties intended the phrase “actions and proceedings” to have a technical meaning limited by the N.Y. C.P.L.R. In common parlance, an arbitration is certainly an action or a proceeding. The United States Supreme Court, our court, and New York state courts routinely refer to arbitrations as “actions” or “proceedings.” See, e.g., 14 Penn Plaza LLC v. Pyett, 556 U.S. 247, 269, 129 S.Ct. 1456, 173 L.Ed.2d 398 (2009) (referencing an “arbitral body conducting a proceeding ” (emphasis added)) (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 634, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)); Sacks v. Dietrich, 663 F.3d 1065, 1066-67 (9th Cir.2011) (discussing “a securities arbitration proceeding to be administered by [FINRA]” (emphasis added)); City of New York v. Uniformed Fire Officers Ass’n, Local 854, 263 A.D.2d 3, 7, 699 N.Y.S.2d 355 (N.Y.App.Div.1999) (“Normally, a party to a valid arbitration agreement is re *745 quired to submit to arbitration and to defer any challenge to the proceeding until an award is rendered.” (emphasis added) (internal quotation marks and citation omitted)). Similarly, the FINRA Rules repeatedly refer to arbitrations held under their authority as “proceedings.” See, e.g., FINRA Rule 12400 (discussing “the selected hearing location for each proceeding” (emphasis added)). What is more, Reno itself refers to the FINRA arbitration as a “proceeding[ ]” and an “action” in its Statement of Claim. In light of these ubiquitous references to arbitration as an action or proceeding, it is of little significance that the N.Y. C.P.L.R. contemplate “actions” or “proceedings” in the civil judicial context.[4]
Third, Reno asserts that if the term “actions and proceedings” included arbitration, the forum selection clauses would make no sense. The Fourth Circuit endorsed this argument in Carilion Clinic. There, the court reasoned that if “actions and proceedings” included arbitration, the forum selection clauses would have to be read with the following substitution: “all proceedings, including arbitration ... shall be brought in [federal court].” Carilion Clinic, 706 F.3d at 329 (omission in original) (emphasis added). The court rejected this reading:
In whatever way that sentence could be read, it could not be read to preclude arbitration; to the contrary, it presumes its availability but localizes it, albeit to a forum where it could not be pursued .... Regardless of how one might explain the commitment of an arbitration proceeding to a court, the sentence surely cannot be read to preclude or waive arbitration.
Id.; see also Dis. Op. at 753-54. We respectfully disagree.[5] An arbitration is an alternative to a civil action in federal court, not an alternative remedy.[6] By their nature, arbitrations are brought in lieu of a federal lawsuit. An arbitration *746 may be enforced in federal court, 9 U.S.C. § 9, but federal courts do not conduct the arbitrations themselves. We thus agree with the Fourth Circuit that it makes no sense to read these forum selection clauses as obligating the parties to bring their arbitrations to federal court, but we reach the opposite conclusion from this premise: the parties have agreed to litigate their disputes in federal court, and that is incompatible with any prior obligation to arbitrate such disputes in another forum. In other words, the question is not whether an arbitration can be brought in federal court. The question is whether, by definition, the term “arbitration” falls under the broad umbrella of “all actions and proceedings.” Because we find that it does, Goldman and Reno have agreed to bring their claims in a judicial action in the District of Nevada, even if those same claims might otherwise have been raised in an arbitral forum in the absence of the forum selection clauses agreed to by the parties.
Fourth, Reno argues that if the term “actions and proceedings” included arbitration, the portion of the forum selection clauses that waives “all right to trial by jury” would become nonsensical. The Fourth Circuit also endorsed this argument in Carilion Clinic, reasoning that, because there is no right to trial by jury, “[t]he more reasonable construction would take the references to ‘court’ and ‘jury trials’ as limiting what is meant by ‘actions and proceedings.’ ” 706 F.3d at 329-30; see also Dis. Op. at 753-54. Again, we respectfully disagree. The waiver of the right to jury in the forum selection clauses “merely states the obvious, that certain ‘actions and proceedings’ would allow for jury trials, and then clarifies that the jury right is forfeited in those instances.” Golden Empire, 922 F.Supp.2d at 442. The forum selection clauses thus commit the parties to federal court, where they consent to a bench trial.
Fifth, both Reno and the dissent argue that if there is a reading of the forum selection clauses that permits Goldman’s default obligation to arbitrate under the FINRA Rules to remain in effect, we must choose that reading. Dis. Op. at 750. And indeed, such a reading is available here. Arbitration awards are not self-enforceable. Accordingly, we could require Goldman to arbitrate at Reno’s request and then require Reno to enforce the arbitration award, if any, in the District of Nevada, thereby harmonizing Goldman’s default obligation to arbitrate with the forum selection clauses. The flaw in this argument is that it erroneously assumes that the presumption in favor of arbitrability applies. Where the presumption applies, we compel arbitration “unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.” AT & T Techs., Inc., 475 U.S. at 650, 106 S.Ct. 1415 (internal quotation marks and citation omitted). Where, as here, the presumption does not apply, however, we use general state-law principles of contract interpretation to effectuate the intent of the parties. As a result, the mere availability of an alternative reading of the forum selection clauses is beside the point.
In light of the foregoing, we will give full effect to the all-inclusive breadth of the forum selection clauses (“all actions and proceedings”), their mandatory nature (“shall”), and their reference to a judicial forum (“the United States District Court for the District of Nevada”). We therefore conclude that the forum selection clauses superseded Goldman’s default obligation to arbitrate under the FINRA Rules and that, by agreeing to these clauses, Reno disclaimed any right it might otherwise have had to the FINRA arbitration forum.
*747 Lastly, Reno contends that, even if the forum selection clauses in the 2005 and 2006 Broker-Dealer Agreements require that Reno bring claims arising out of those agreements in the District of Nevada, Reno’s claims arising solely out of the 2005 and 2006 Underwriter Agreements — which do not contain a forum selection clause— may still proceed in FINRA arbitration. Reno is mistaken on this point, too.
The 2005 and 2006 Broker-Dealer Agreements contain broad merger clauses referencing “the other agreements and instruments executed and delivered in connection with the issuance of the ARS” and stipulating that the Broker-Dealer Agreements “contain the entire agreement between the parties relating to the subject matter hereof.” The “other agreements and instruments executed and delivered in connection with the issuance of the ARS” certainly include the 2005 and 2006 Underwriter Agreements. As a result, the forum selection clauses also encompass claims arising out of those agreements.
Moreover, as the Statement of Claim reveals, all of Reno’s claims are inextricably linked to the 2005 and 2006 Broker-Dealer Agreements. The core of Reno’s claims is that, when negotiating with Reno to become both underwriter and broker-dealer for the 2005 and 2006 Bonds, Goldman did not disclose its general practice of placing support bids to prevent ARS auctions from failing. Reno asserts that “[h]ad [it] known that [its ARS] would be wholly-dependent on Goldman’s continued support bidding practice ..., Reno would never have taken the risk.... Instead, Reno could have chosen an alternative structure for the financing.” As damages, Reno seeks, inter alia, “disgorgement of all fees and costs associated with issuing the ARS [and] conducting the auctions,” i.e., both underwriter and broker-dealer fees. Accordingly, all of Reno’s claims arise, at least in part, out of the 2005 and 2006 Broker-Dealer Agreements and are therefore subject to the forum selection clauses that limit jurisdiction to the District of Nevada.
IV. CONCLUSION
We conclude that we, rather than FIN-RA, must determine the arbitrability of this dispute. Although we agree with the district court that Reno qualifies as Goldman’s customer under FINRA Rule 12200, we hold that Reno disclaimed its right to FINRA arbitration by agreeing to the forum selection clauses in the 2005 and 2006 Broker-Dealer Agreements. Consequently, we reverse the district court’s order and final judgment. And despite Goldman’s “overwhelming likelihood of success on the merits,” we remand this case to the district court to consider the remaining Winter factors consistent with this opinion. Evans v. Shoshone-Bannock Land Use Policy Comm’n, 736 F.3d 1298, 1307 (9th Cir.2013) (noting that “a preliminary injunction is an extraordinary remedy never awarded as of right” and that “the grant of a preliminary injunction is a matter committed to the discretion of the trial judge” (internal quotation marks, citations, and alterations omitted)).
REVERSED and REMANDED.

. The Federal Arbitration Act ("FAA”) provides that:
A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.
9 U.S.C. § 2. FINRA Rule 12200 constitutes an "agreement in writing” under the FAA, and, assuming Reno is a customer, it is entitled to invoke FINRA Rule 12200 as an intended third-party beneficiary in its dispute with Goldman. See Kidder, Peabody & Co. v. Zinsmeyer Trusts P’ship, 41 F.3d 861, 863-64 (2d Cir.1994); see also Waterford Inv. Servs., Inc. v. Bosco, 682 F.3d 348, 353 (4th Cir.2012); MONY Sec. Corp. v. Bornstein, 390 F.3d 1340, 1342 (11th Cir.2004).

. We note that Golden Empire is on appeal to the Second Circuit and will be heard on April 4, 2014.

. The 2005 and 2006 Broker-Dealer Agreements stipulate that they "shall be governed by and construed in accordance with the laws of the State of New York....”

. Reno and the dissent contend that the forum selection clauses at issue here are narrower than the provision covering “any dispute” in Applied Energetics, where the Second Circuit found that a similar forum selection clause had displaced an earlier agreement to arbitrate. 645 F.3d at 525. According to Reno and the dissent, because the forum selection clauses here do not purport to address "any dispute,” they should be limited to .judicial proceedings arising under the agreements between the parties. Dis. Op. at 750-52. This argument assumes that the term “dispute” is necessarily broader than the term "actions and proceedings.” We cannot see why this would be so. The fact that the term "dispute" includes arbitration does not mean that the term “actions and proceedings” does not. To the contrary, we now follow the Supreme Court, our own precedents, New York state courts, the FINRA Rules, and Reno itself in concluding that the term “actions and proceedings,” by its plain meaning, encompasses arbitration.

. As the Golden Empire court explained, the same logical conclusion would follow from the analogous substitution of "actions in the Nevada state courts” since actions in the Nevada state courts cannot -be brought in the District of Nevada; "[njevertheless, it can hardly be argued that such a dispute would fall outside the heading of ‘actions and proceedings.'’ ” 922 F.Supp.2d at 442.

.We use the term “arbitration” to refer both to a particular kind of proceeding and to an alternative forum. Thus, we may speak of "commencing an arbitration” rather than "commencing a lawsuit.” We also may say that we are "going to arbitration” instead of "going to court.” The point of the forum selection clauses is that "all actions and proceedings” must be pursued in a particular forum, federal district court in Nevada. Because arbitration is an “action” or "proceeding,” and "all actions and proceedings” must be brought in federal district court, Goldman and Reno have agreed to resolve all of their disputes in judicial proceedings rather than arbitrations. Even if we think of an arbitration as a forum, it is an alternative forum to the forum agreed upon by the parties.