**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

GOLDMAN, SACHS & CO.,
*Plaintiff-Appellant*,

v.

CITY OF RENO,

*Defendant-Appellee*.

No. 13-15445

D.C. No.
3:12-cv-00327-RCJ-WGC

OPINION

Appeal from the United States District Court
for the District of Nevada
Robert Clive Jones, Chief District Judge, Presiding

Argued and Submitted
September 9, 2013—San Francisco, California

Filed March 31, 2014

Before: Mary M. Schroeder and Jay S. Bybee, Circuit
Judges, and Anthony J. Battaglia, District Judge.[*]

Opinion by Judge Bybee;
Partial Concurrence and Partial Dissent by Judge Battaglia

---

[*] The Honorable Anthony J. Battaglia, District Judge for the U.S.
District Court for the Southern District of California, sitting by
designation.

# SUMMARY[**]

### Arbitration / Forum Selection

The panel reversed the district court's denial of a preliminary injunction, and its final judgment in favor of the City of Reno, in an action brought by Goldman, Sachs & Co. to enjoin Financial Industry Regulatory Authority arbitration.

The panel held that the forum selection clauses in the parties' contracts superseded any right to Financial Industry Regulatory Authority ("FINRA") arbitration. The panel held that the court, rather than FINRA, must determine the arbitrability of the dispute. The panel further held that although Reno qualified as Goldman's customer under FINRA Rule 12200, Reno disclaimed its right to FINRA arbitration by agreeing to the forum selection clauses in the parties' agreements. The panel remanded to the district court to consider whether a preliminary injunction is warranted.

District Judge Battaglia concurred with Parts III-A and III-B of the majority's opinion, and dissented from the finding that the contracting parties' forum selection clauses superseded Goldman's pre-existing obligation to arbitrate under the FINRA Rules. Judge Battaglia would affirm the district court's denial of Goldman's motion to preliminarily enjoin the FINRA arbitration.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Matthew A. Schwartz (argued), David H. Braff, and Andrew H. Reynard, Sullivan & Cromwell LLP, New York, New York; Stanley W. Parry and Jon T. Pearson, Ballard Spahr LLP, Las Vegas, Nevada, for Plaintiff-Appellant.

James R. Swanson (argued) and Alysson L. Mills, Fishman Haygood Phelps Walmsley Willis & Swanson, LLP, New Orleans, Louisiana; Robert A. Winner, Winner & Carson, PC, Las Vegas, Nevada, for Defendant-Appellee.

**OPINION**

BYBEE, Circuit Judge:

In 2005 and 2006, the City of Reno issued approximately $211 million in complex securities and employed Goldman, Sachs & Co. ("Goldman") as its sole underwriter and broker-dealer. Years after Reno's financing collapsed, Reno initiated an arbitration before the Financial Industry Regulatory Authority ("FINRA") to resolve its claims against Goldman arising out of their contractual relationship. Goldman then filed this action to enjoin the FINRA arbitration, arguing that (1) Reno was not a "customer" entitled to arbitrate under FINRA Rule 12200 and (2), at any rate, Reno had disclaimed any right to arbitrate by agreeing to forum selection clauses in the contracts between the parties. Reno responded that FINRA had the right in the first instance to determine arbitrability. The district court agreed with Reno and disagreed with Goldman. It therefore denied Goldman's motion for injunctive relief and entered final judgment in favor of Reno.

We have little difficulty determining that Reno was Goldman's "customer" under the FINRA Rules. However, the second question—whether the forum selection clauses superseded Goldman's obligation to arbitrate under FINRA Rule 12200—has been the subject of litigation in multiple circuits, with decidedly mixed results. The Fourth Circuit and the District of Minnesota have held that an identical forum selection clause does not supersede a FINRA member's obligation to arbitrate under the FINRA Rules, *see UBS Fin. Servs., Inc. v. Carilion Clinic*, 706 F.3d 319 (4th Cir. 2013); *UBS Sec. LLC v. Allina Health Sys.*, No. 12-2090, 2013 WL 500373 (D. Minn. Feb. 11, 2013), while two judges within the Southern District of New York have held that materially identical forum selection clauses trump FINRA Rule 12200 such that the customer must bring its claims in federal court, *see Goldman, Sachs & Co v. N.C. Mun. Power Agency No. One*, No. 13-CV-1319, 2013 WL 6409348, at *7 (S.D.N.Y. Dec. 9, 2013); *Goldman, Sachs & Co. v. Golden Empire Schools Fin. Auth.*, 922 F. Supp. 2d 435 (S.D.N.Y. 2013). Because we find that the forum selection clauses in the parties' contracts superseded any right to FINRA arbitration, we reverse the district court's order and final judgment, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

In 2005, Reno undertook a series of city projects. To finance these projects, Reno chose to issue municipal bonds. Reno approached Goldman to discuss financing options, and Goldman advised Reno to issue the debt in the form of auction rate securities ("ARS").

ARS are long-term, variable-rate instruments with interest rates that reset at periodic auctions. At each auction, ARS

investors submit a bid setting forth the number of ARS that they wish to purchase, hold, or sell, and the lowest interest rate that they will accept. The lowest interest rate at which the entire issue can be sold at par establishes the new interest rate to be paid until the next auction. This new interest rate is known as the "clearing rate." If there are insufficient bids to cover the bonds available for sale at the auction, however, the auction "fails," and the interest rate is set at a contractual "maximum rate" until the next auction.

With Goldman's assistance, Reno issued $73.45 million in ARS in October 2005 (the "2005 Bonds"). At that time, Reno and Goldman entered into two written agreements that governed their relationship: (1) an underwriter agreement that outlined Goldman's duty to purchase and offer the 2005 Bonds (the "2005 Underwriter Agreement") and (2) a separate, but contemporaneously executed, broker-dealer agreement that outlined Goldman's duty to manage the auctions for the 2005 Bonds (the "2005 Broker-Dealer Agreement). The contracts were entered into after arm's-length negotiations in which both parties were represented by counsel.

For purposes of our analysis, the 2005 Broker-Dealer Agreement contains two significant clauses. First, it contains a forum selection clause providing that:

> The parties agree that all actions and proceedings arising out of this Broker-Dealer Agreement or any of the transactions contemplated hereby shall be brought in the United States District Court for the District of Nevada and that, in connection with any such

action or proceeding, the parties shall submit to the jurisdiction of, and venue in, such court.

Second, the 2005 Broker-Dealer Agreement contains a merger clause providing that:

This Broker-Dealer Agreement, and the other agreements and instruments executed and delivered in connection with the issuance of the ARS, contain the entire agreement between the parties relating to the subject matter hereof, and there are no other representations, endorsements, promises, agreements or understandings, oral, written or inferred, between the parties relating to the subject matter hereof.

Reno and Goldman entered into substantially identical contracts in 2006 (the "2006 Underwriter Agreement" and the "2006 Broker-Dealer Agreement") when Reno financed a new city project by issuing $137.43 million in ARS (the "2006 Bonds").

Reno compensated Goldman for its services under each of these four agreements. Pursuant to the 2005 and 2006 Underwriter Agreements, Goldman received an underwriter's discount by purchasing the 2005 and 2006 Bonds for less than their face value. In addition, pursuant to the 2005 and 2006 Broker-Dealer Agreements, Goldman received annual broker-dealer fees in exchange for its management of the ARS auctions.

In 2008, the ARS market collapsed, and Reno's ARS auctions began to fail. As a result, Reno was forced to

refinance the 2005 and 2006 Bonds at considerable cost. According to Reno, these costs should be attributed to Goldman's conduct. Specifically, Reno alleges that, where Goldman served as underwriter, it had a general practice of placing support bids in ARS auctions to ensure that these auctions did not fail; that Goldman did not disclose this general practice to Reno before Reno issued the 2005 and 2006 Bonds; that, consistent with Goldman's general practice, it placed support bids in Reno's ARS auctions until 2008; that Goldman's decision to stop placing support bids in 2008 caused Reno's ARS auctions to fail; and that, if Goldman had told Reno about this general practice, Reno would not have issued ARS to finance its city projects. Based on these allegations, Reno claims that Goldman's conduct breached its fiduciary duty, amounted to fraud and negligent misrepresentation, violated the Securities Exchange Act of 1934, violated the Nevada Securities Act, and violated Municipal Securities Rulemaking Board and FINRA Rules.

In order to resolve these claims through arbitration, Reno filed a Statement of Claim against Goldman before FINRA on February 10, 2012. FINRA is a self-regulatory organization that has "the authority to exercise comprehensive oversight over 'all securities firms that do business with the public.'" *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir. 2011) (quoting 72 Fed. Reg. 42169, 42170 (Aug. 1, 2007)). To exercise this oversight, FINRA has instituted rules with which its members, including Goldman, agree to comply. *See* FINRA Bylaws, art. IV, § 1(a). And one of these rules provides that FINRA members and their customers "must arbitrate a dispute . . . [i]f [a]rbitration . . . [is] [r]equested by the customer; [t]he dispute is between a customer and a member

. . . ; and [t]he dispute arises in connection with the business activities of the member . . . ." FINRA Rule 12200.

In response to Reno's Statement of Claim, Goldman filed this action in the United States District Court for the District of Nevada, seeking a declaratory judgment that FINRA lacks jurisdiction over the dispute and an injunction against the arbitration proceedings. In Goldman's motion for preliminary injunction, filed shortly after its complaint, Goldman argued that Reno was not a "customer" entitled to arbitrate under FINRA Rule 12200 and that, at any rate, Reno had disclaimed any right to arbitrate by agreeing to the forum selection clauses in the 2005 and 2006 Broker-Dealer Agreements.

The district court denied Goldman's motion for preliminary injunction. *Goldman, Sachs & Co. v. City of Reno*, No. 3:12-CV-00327, 2012 WL 5944966 (D. Nev. Nov. 26, 2012). In so doing, the district court reached three legal conclusions that are at issue on appeal. First, the district court found that FINRA had jurisdiction to decide the arbitrability of Reno's claims. Second, the district court determined that Reno was a "customer" under FINRA Rule 12200. And third, the district court found that the forum selection clauses in the 2005 and 2006 Broker-Dealer Agreements did not supersede Reno's right to FINRA arbitration. Accordingly, the district court ruled that Goldman was not likely to succeed on the merits.

Following the district court's ruling, the parties agreed that there was nothing further to litigate, and the district court entered final judgment in favor of Reno. Goldman then filed this appeal.

## II. STANDARD OF REVIEW

In order to obtain a preliminary injunction, Goldman must demonstrate that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

We review the district court's denial of a preliminary injunction for an abuse of discretion, its factual findings for clear error, and its conclusions of law de novo. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1157 (9th Cir. 2007).

## III. DISCUSSION

There are three issues on appeal. First, we address whether FINRA must determine the arbitrability of this matter in the first instance. Because we conclude that we, rather than FINRA, have jurisdiction to determine arbitrability, we reach the remaining two issues. Second, we consider whether Reno was a "customer" of Goldman, giving it the right to invoke arbitration under the FINRA Rules. Third, we examine whether Reno and Goldman contracted around FINRA Rule 12200 through forum selection clauses and agreed to litigate any claims in the United States District Court for the District of Nevada.

A. *Jurisdiction to determine arbitrability*

Both the arbitrability of the merits of a dispute and the question of who has the primary power to decide arbitrability depend on the agreement of the parties. *See First Options of*

*Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). "But, unlike the arbitrability of claims in general, whether the court or the arbitrator decides arbitrability is an issue for judicial determination unless the parties *clearly and unmistakably provide otherwise*." *Oracle Am., Inc. v. Myriad Group A.G.*, 724 F.3d 1069, 1072 (9th Cir. 2013) (internal quotation marks and citations omitted). Thus, "there is a presumption that courts will decide which issues are arbitrable." *Id*.

The district court concluded that, because Goldman is a FINRA member, it has agreed to FINRA arbitration on the issue of arbitrability itself. As support for this conclusion, the district court relied on FINRA Rule 12203(a), which states that "[t]he Director may decline to permit the use of the FINRA arbitration forum if the Director determines that . . . the subject matter of the dispute is inappropriate, or that accepting the matter would pose a risk to the health or safety of arbitrators, staff, or parties or their representatives."

This legal conclusion was incorrect. FINRA Rule 12203(a) does not provide "clear and unmistakable" evidence that FINRA members like Goldman have consented to FINRA determination of the issue of arbitrability. Instead, FINRA Rule 12203(a) simply describes certain circumstances under which the FINRA Director may deny access to the FINRA arbitration forum. Furthermore, neither the underwriter nor the broker-dealer agreements provide "clear and unmistakable" evidence that the parties intended that FINRA would determine the issue of arbitrability. The presumption that the court will decide which issues are arbitrable remains unrebutted, and we must make the call.

## B.  *Reno as Goldman's "Customer"*

"[A]rbitration is a matter of contract," *Rent-A-Center, W., Inc. v. Jackson*, 130 S. Ct. 2772, 2776 (2010), and there is "a liberal federal policy favoring arbitration agreements."[1] *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). "In line with these principles, courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms." *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1745 (2011) (internal citations omitted).

Here, the relevant arbitration provision is FINRA Rule 12200, which requires FINRA members like Goldman to arbitrate disputes arising out of their business activities at the request of a "customer." Goldman denies any obligation to

---

[1] The Federal Arbitration Act ("FAA") provides that:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. FINRA Rule 12200 constitutes an "agreement in writing" under the FAA, and, assuming Reno is a customer, it is entitled to invoke FINRA Rule 12200 as an intended third-party beneficiary in its dispute with Goldman. *See Kidder, Peabody & Co. v. Zinsmeyer Trusts P'ship*, 41 F.3d 861, 863–64 (2d Cir. 1994); *see also Waterford Inv. Servs., Inc. v. Bosco*, 682 F.3d 348, 353 (4th Cir. 2012); *MONY Sec. Corp. v. Bornstein*, 390 F.3d 1340, 1342 (11th Cir. 2004).

arbitrate under this rule because Reno was not a "customer" as that term is used in the FINRA Rules.

The FINRA Rules define "customer" only in the negative: "A customer shall not include a broker or dealer." FINRA Rule 12100(i). This definition does not tell us what a "customer" *is*, and because Reno is neither a broker nor a dealer, the FINRA Rules' definition, standing alone, cannot tell us whether Reno fits the bill.

Goldman argues that Reno was not a "customer" because their relationship did not relate directly to investment or brokerage services. As support for this narrow definition, Goldman cites the Eighth Circuit's decision in *Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc.*, 264 F.3d 770 (8th Cir. 2001). In *Fleet Boston*, the court considered whether "a 'customer' is everyone who is not a broker or dealer." *Id*. at 772. Rejecting this broad definition, the court explained that "the [FINRA] Rules were [not] meant to apply to every sort of financial service a [FINRA] member might provide, regardless of how remote that service might be from the investing or brokerage activities, which [FINRA] oversees." *Id*. The court then held that "[FINRA] Rules support a general definition of 'customer' as one who receives investment and brokerage services *or otherwise deals more directly with securities than what occurred here*." *Id*. (emphasis added). Although the court said it was a "close call," the Eighth Circuit held that where the purported customer "only received financial advice," it did not qualify as a "customer" entitled to arbitration. *Id*. at 773.

Other circuits have refined the definition of "customer" in the years following *Fleet Boston*. *See Carilion Clinic*, 706 F.3d at 325; *W. Va. Univ. Hosps., Inc.*, 660 F.3d at 651.

In *Carilion Clinic*, UBS and Citigroup sought to enjoin arbitration under the FINRA Rules, contending that Carilion Clinic was not a "customer." 706 F.3d at 321. The Fourth Circuit rejected this contention. In so doing, the court looked to other provisions of the FINRA Rules to provide context for the definition of "customer." *Id*. at 324–35. Specifically, the court noted that FINRA Rule 12200 provides that arbitrable disputes must arise in connection with the "business activities" of the FINRA Member, suggesting that a person must be a customer of a FINRA member's business activities to obtain arbitration; that FINRA Rule 12100(r) suggests that the business activities of a FINRA member involve "investment banking or securities business"; and that FINRA's mission, among other things, is "[t]o promote through cooperative effort the investment banking and securities business, to standardize its principles and practices, to promote therein high standards of commercial honor, and to encourage and promote among members observance of federal and state securities laws." Restated Certificate of Incorporation of Financial Industry Regulatory Authority, Inc. § 3 (July 2, 2010).

Subject to the scope indicated by the FINRA Rules, however, the court reasoned that "the term 'customer' in Rule 12200 still retains its generally accepted meaning—'one that purchases a commodity or service.'" *Carilion Clinic*, 706 F.3d at 325 (quoting *Merriam Webster's Collegiate Dictionary* 308 (11th ed. 2007)). The court concluded that a "customer" is "one, not a broker or dealer, who purchases commodities or services from a FINRA member in the course of the member's business activities insofar as those activities are covered by FINRA's regulation, namely the activities of investment banking and the securities business." *Id*; *see also W. Va. Univ. Hosps., Inc.*, 660 F.3d at 650. Thus, because

UBS and Citigroup had provided a variety of services to Carilion Clinic in connection with the issuance of ARS bonds, Carilion Clinic was their "customer." *Carilion Clinic*, 706 F.3d at 327–28.

Similarly, in *UBS Financial Services, Inc. v. West Virginia University Hospitals*, West Virginia University Hospitals ("WVUH") issued $329 million in bonds, a portion of which were issued as ARS. 660 F.3d at 645. UBS served as "both the lead underwriter and the main broker-dealer responsible for facilitating the Dutch auctions in which WVUH's bonds were resold and their interest rates set." *Id.* Like Reno and Goldman, WVUH and UBS entered into underwriter and broker-dealer agreements. UBS facilitated the auctions, for which it was paid a fee, and was permitted to purchase the ARS at a discount rate. *Id.* The Second Circuit concluded that "[t]he term 'customer' includes at least a non-broker or non-dealer who purchases, or undertakes to purchase, a good or service from a FINRA member." *Id.* at 650. On that basis, "WVUH was UBS's customer because WVUH purchased a service, specifically auction services, from UBS." *Id.*

We find the Second and Fourth Circuits' analysis persuasive. Accordingly, we conclude that a "customer" is a non-broker and non-dealer who purchases commodities or services from a FINRA member in the course of the member's FINRA-regulated business activities, i.e., the member's investment banking and securities business activities.

With this definition in mind, we find that Reno easily qualifies as Goldman's "customer." To finance a series of city projects, Reno issued approximately $211 million in ARS

bonds. Pursuant to the 2005 and 2006 Underwriter and Broker-Dealer Agreements, Goldman served as the underwriter for the 2005 and 2006 Bonds and as the broker-dealer for the ARS auctions; sold Reno interest rate swaps to protect the financing structure; acted as Reno's agent in dealing with the rating agencies; conducted discussions with bond insurers on Reno's behalf; and provided monitoring and advisory services for the 2005 and 2006 Bonds and the interest rate swaps. Goldman provided these services in the course of its securities business activities, and Reno compensated Goldman in the form of underwriter's discounts and annual broker-dealer fees. Accordingly, under both the 2005 and 2006 Underwriter and Broker-Dealer Agreements, Reno was Goldman's "customer." And because Goldman's customer has requested arbitration, FINRA Rule 12200 requires Goldman to arbitrate unless Reno has disclaimed its right to arbitrate through contract.

C. *Forum Selection Clauses*

Goldman argues that, even if Reno is its customer, Goldman may enjoin the ongoing FINRA arbitration because Reno disclaimed its right to arbitrate by agreeing to the forum selection clauses in the 2005 and 2006 Broker-Dealer Agreements. These forum selection clauses recite that "all actions and proceedings . . . shall be brought in the . . . District of Nevada." As a threshold matter, we agree with Goldman that a contract between the parties can supersede the default obligation to arbitrate under the FINRA Rules. *See, e.g.*, *Carilion Clinic*, 706 F.3d at 328; *Applied Energetics, Inc. v. NewOak Capital Markets, LLC*, 645 F.3d 522, 525 (2d Cir. 2011). The question, then, is whether the forum selection clauses at issue here sufficiently demonstrate the parties' intent to do so. We conclude that they do.

Goldman had a default obligation to arbitrate with its customers under the FINRA Rules, but Goldman was free to make alternative arrangements with each individual customer when the parties formed or modified their contractual relationship. Here, at the time the contracts were negotiated, Goldman and Reno agreed to forum selection clauses which clearly indicate that the parties never agreed to arbitrate claims arising out of their contractual relationship. Instead, from the beginning of this relationship, Goldman and Reno agreed to bring such claims in the District of Nevada. We therefore hold that these forum selection clauses superseded Goldman's default obligation to arbitrate under the FINRA Rules.

### 1.  Legal Standards

The Supreme Court has emphasized that the "first principle" of its arbitration decisions is that "[a]rbitration is strictly a matter of consent and thus is a way to resolve those disputes—*but only those disputes*—that the parties have agreed to submit to arbitration." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. 2847, 2857 (2010) (internal quotation marks and citations omitted). When determining whether parties have agreed to submit to arbitration, "we apply 'general state-law principles of contract interpretation, while giving due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration.'" *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1044 (9th Cir. 2009) (quoting *Wagner v. Stratton Oakmont, Inc.*, 83 F.3d 1046, 1049 (9th Cir. 1996)). This policy, however, "is merely an acknowledgment of the FAA's commitment to 'overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and to place such agreements *upon the same footing*

*as other contracts*.'" *Granite Rock*, 130 S. Ct. at 2859 (emphasis added) (quoting *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989)). Accordingly, the Supreme Court "[has] never held that this policy overrides the principle that a court may submit to arbitration 'only those disputes . . . that the parties have agreed to submit.' Nor [has the Court] held that courts may use policy considerations as a substitute for party agreement." *Id*. (citations omitted) (quoting *First Options of Chi.*, 514 U.S. at 943).

Guided by this first principle, we do not apply the so-called "presumption in favor of arbitrability" in every case. Where the arbitrability of a dispute is contested, we must decide whether the parties are contesting the *existence* or the *scope* of an arbitration agreement. If the parties contest the *existence* of an arbitration agreement, the presumption in favor of arbitrability does not apply. If the parties contest the scope of an arbitration agreement, we must determine whether the *scope* of the agreement covers the relevant dispute. The presumption in favor of arbitrability applies only where the *scope* of the agreement is ambiguous as to the dispute at hand, and we adhere to the presumption and order arbitration only where the presumption is not rebutted. *Granite Rock*, 130 S. Ct. at 2858–60; *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) ("[W]here the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." (internal quotation marks, brackets, and citation omitted)); *Mundi*, 555 F.3d at 1044–45 ("The presumption in favor of arbitration . . . does not apply if

contractual language is plain that arbitration of a particular controversy is not within the scope of the arbitration provision." (internal quotation marks and citation omitted)); *Bank Julius Baer & Co. v. Waxfield Ltd.*, 424 F.3d 278, 281 (2d Cir. 2005).

Consistent with this analytical framework, we must decide whether Goldman contests the existence or scope of a valid arbitration agreement. Goldman and Reno did not include an express arbitration clause in the Underwriter or Broker-Dealer Agreements. Instead, as a FINRA member, Goldman had a default obligation to arbitrate at the request of a "customer." And as a "customer," Reno stood to benefit from this default obligation, provided that the parties did not contract around it. According to Goldman, however, that is precisely what occurred when the parties agreed to the forum selection clauses: Reno disclaimed any right to arbitrate that it might otherwise have had. If Goldman is correct that the forum selection clauses superseded its default obligation under the FINRA Rules, Goldman and Reno agreed *not* to arbitrate any claims that might arise out of their contractual relationship at the very time this relationship was formed. Goldman thus contests the *existence*, rather than the *scope*, of an arbitration agreement, and, therefore, the presumption in favor of arbitrability does not apply in this case.

The Second Circuit reached the same conclusion on similar facts in *Applied Energetics*, 645 F.3d at 526. There, the parties included an arbitration clause in an "Engagement Agreement." That clause, however, was allegedly superseded by a forum selection clause in a subsequent "Placement Agreement." *Id*. at 523. The court noted that "while doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not

apply to disputes concerning whether an agreement to arbitrate has been made." *Id*. at 526. Consequently, because the question of whether the Placement Agreement had superseded the Engagement Agreement was a dispute over the existence, rather than the scope, of the agreement to arbitrate, "the presumption in favor of arbitrability [did] not apply." *Id*.

Because we likewise conclude that the presumption in favor of arbitrability does not apply here, we use general state-law principles of contract interpretation to decide whether a contractual obligation to arbitrate exists, *see Mundi*, 555 F.3d at 1044: If the parties' agreement is clear on its face, we must enforce it as written. *See Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002) ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."); *accord Canfora v. Coast Hotels & Casinos, Inc.*, 121 P.3d 599, 603 (Nev. 2005) ("[W]hen a contract is clear on its face, it will be construed from the written language and enforced as written." (internal quotation marks and citation omitted)). Accordingly, to avoid arbitration, the forum selection clauses to which Goldman and Reno agreed need only be "sufficiently specific to impute to the contracting parties the reasonable expectation that they are superseding, displacing, or waiving the arbitration obligation created by FINRA Rule 12200." *Carilion Clinic*, 706 F.3d at 328.

2. Application

With this standard in mind, we turn to the text of the forum selection clauses and conclude that Reno has clearly and unambiguously disclaimed any right it might otherwise have had to FINRA arbitration. As previously mentioned, the

forum selection clauses provide that "all actions and proceedings . . . shall be brought in the . . . District of Nevada." Reno argues that the phrase "all actions and proceedings" refers only to judicial proceedings and is not incompatible with Reno enforcing its rights under FINRA Rule 12200.

We are not writing on a blank slate. Although the precise question is new in our court, it has been the subject of litigation in federal courts around the country. The Fourth Circuit and the District of Minnesota have held that the phrase "all actions and proceedings" is in fact limited to judicial proceedings, *see Carilion Clinic*, 706 F.3d at 329–30; *Allina Health Sys.*, 2013 WL 500373, at *6 , while the Southern District of New York has held that the very same phrase, "by its plain terms, encompasses arbitration," *Golden Empire*, 922 F. Supp. 2d at 443; *see also N.C. Mun. Power Agency*, 2013 WL 6409348, at *6.[2] We have benefitted from the thoughtful opinions of these courts and recognize that the question is a close one. For the reasons that follow, we agree with the Southern District of New York that the parties have agreed to resolve their contractual disputes in federal court in Nevada.

First, noting that the forum selection clauses make no reference to arbitration, Reno argues that if Goldman had intended to contract out of its duty to arbitrate, it could have and should have included an express waiver of arbitration in the parties' agreements. While this certainly would be an easier case if the parties had included an express waiver, we know of no requirement that they do so. Rather, because the

---

[2] We note that *Golden Empire* is on appeal to the Second Circuit and will be heard on April 4, 2014.

presumption in favor of arbitrability does not apply here, the forum selection clauses need only be sufficiently specific to impute to the contracting parties the reasonable expectation that they would litigate any disputes in federal court, thereby superseding Goldman's default obligation to arbitrate under FINRA Rule 12200. *See Applied Energetics*, 645 F.3d at 525–26. Thus, although an express waiver might be preferable, we decline to impose formal incantations when applying general state-law principles of contract interpretation. *But see Carilion Clinic*, 706 F.3d at 329 ("[O]ne would reasonably expect that a clause designed to supersede, displace, or waive arbitration would mention arbitration.").

Second, Reno points out that the forum selection clauses require only that "actions and proceedings" be brought in federal court in Nevada. Reno contends that the New York Civil Practice Laws and Rules[3] ("N.Y. C.P.L.R.") do not consider arbitrations to be "actions" or "proceedings" and that, as a result, the forum selection clauses do not encompass arbitration. *See* N.Y. C.P.L.R. § 103 (defining civil judicial disputes as "actions" or "special proceedings"); *id.* § 304 ("An action is commenced by filing a summons and complaint or summons with notice . . . . A special proceeding is commenced by filing a petition . . . ."). In *Goldman, Sachs & Co. v. Golden Empire Schools Financing Authority*, the Southern District of New York found that this argument "strains reason," noting that "the Forum Selection Clause negotiated between [the ARS issuer] and Goldman makes no mention of the C.P.L.R. and suggests no such limitation."

---

[3] The 2005 and 2006 Broker-Dealer Agreements stipulate that they "shall be governed by and construed in accordance with the laws of the State of New York . . . ."

922 F. Supp. 2d at 442. The same is true here; there is no evidence the parties intended the phrase "actions and proceedings" to have a technical meaning limited by the N.Y. C.P.L.R. In common parlance, an arbitration is certainly an action or a proceeding. The United States Supreme Court, our court, and New York state courts routinely refer to arbitrations as "actions" or "proceedings." *See, e.g.*, *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 269 (2009) (referencing an "arbitral body conducting a *proceeding*" (emphasis added) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 634 (1985)); *Sacks v. Dietrich*, 663 F.3d 1065, 1066–67 (9th Cir. 2011) (discussing "a securities arbitration *proceeding* to be administered by [FINRA]" (emphasis added)); *City of New York v. Uniformed Fire Officers Ass'n, Local 854*, 263 A.D.2d 3, 7 (N.Y. App. Div. 1999) ("Normally, a party to a valid arbitration agreement is required to submit to arbitration and to defer any challenge to the *proceeding* until an award is rendered." (emphasis added) (internal quotation marks and citation omitted)). Similarly, the FINRA Rules repeatedly refer to arbitrations held under their authority as "proceedings." *See, e.g.*, FINRA Rule 12400 (discussing "the selected hearing location for each *proceeding*" (emphasis added)). What is more, Reno itself refers to the FINRA arbitration as a "proceeding[]" and an "action" in its Statement of Claim. In light of these ubiquitous references to arbitration as an action or proceeding, it is of little significance that the N.Y. C.P.L.R. contemplate "actions" or "proceedings" in the civil judicial context.[4]

---

[4] Reno and the dissent contend that the forum selection clauses at issue here are narrower than the provision covering "any dispute" in *Applied Energetics*, where the Second Circuit found that a similar forum selection clause had displaced an earlier agreement to arbitrate. 645 F.3d at 525.

Third, Reno asserts that if the term "actions and proceedings" included arbitration, the forum selection clauses would make no sense. The Fourth Circuit endorsed this argument in *Carilion Clinic*. There, the court reasoned that if "actions and proceedings" included arbitration, the forum selection clauses would have to be read with the following substitution: "all proceedings, *including arbitration* . . . shall be brought in [federal court]." *Carilion Clinic*, 706 F.3d at 329 (omission in original) (emphasis added). The court rejected this reading:

> In whatever way that sentence could be read, it could not be read to *preclude* arbitration; to the contrary, it presumes its availability but localizes it, albeit to a forum where it could not be pursued . . . . Regardless of how one might explain the commitment of an arbitration proceeding to a court, the sentence surely cannot be read to preclude or waive arbitration.

According to Reno and the dissent, because the forum selection clauses here do not purport to address "any dispute," they should be limited to judicial proceedings arising under the agreements between the parties. Dis. Op. at 35–37. This argument assumes that the term "dispute" is necessarily broader than the term "actions and proceedings." We cannot see why this would be so. The fact that the term "dispute" includes arbitration does not mean that the term "actions and proceedings" does not. To the contrary, we now follow the Supreme Court, our own precedents, New York state courts, the FINRA Rules, and Reno itself in concluding that the term "actions and proceedings," by its plain meaning, encompasses arbitration.

*Id.*; *see also* Dis. Op. at 41–42. We respectfully disagree.[5] An arbitration is an alternative to a civil action in federal court, not an alternative remedy.[6] By their nature, arbitrations are brought in lieu of a federal lawsuit. An arbitration may be enforced in federal court, 9 U.S.C. § 9, but federal courts do not conduct the arbitrations themselves. We thus agree with the Fourth Circuit that it makes no sense to read these forum selection clauses as obligating the parties to bring their arbitrations to federal court, but we reach the opposite conclusion from this premise: the parties have agreed to litigate their disputes in federal court, and that is incompatible with any prior obligation to arbitrate such disputes in another forum. In other words, the question is not whether an arbitration can be brought in federal court. The question is whether, by definition, the term "arbitration" falls under the broad umbrella of "all actions and proceedings." Because we find that it does, Goldman and Reno have agreed to bring

---

[5] As the *Golden Empire* court explained, the same logical conclusion would follow from the analogous substitution of "actions in the Nevada state courts" since actions in the Nevada state courts cannot be brought in the District of Nevada; "[n]evertheless, it can hardly be argued that such a dispute would fall outside the heading of 'actions and proceedings.'" 922 F. Supp. 2d at 442.

[6] We use the term "arbitration" to refer both to a particular kind of proceeding and to an alternative forum. Thus, we may speak of "commencing an arbitration" rather than "commencing a lawsuit." We also may say that we are "going to arbitration" instead of "going to court." The point of the forum selection clauses is that "all actions and proceedings" must be pursued in a particular forum, federal district court in Nevada. Because arbitration is an "action" or "proceeding," and "all actions and proceedings" must be brought in federal district court, Goldman and Reno have agreed to resolve all of their disputes in judicial proceedings rather than arbitrations. Even if we think of an arbitration as a forum, it is an alternative forum to the forum agreed upon by the parties.

their claims in a *judicial* action in the District of Nevada, even if those same claims might otherwise have been raised in an arbitral forum in the absence of the forum selection clauses agreed to by the parties.

Fourth, Reno argues that if the term "actions and proceedings" included arbitration, the portion of the forum selection clauses that waives "all right to trial by jury" would become nonsensical. The Fourth Circuit also endorsed this argument in *Carilion Clinic*, reasoning that, because there is no right to trial by jury, "[t]he more reasonable construction would take the references to 'court' and 'jury trials' as limiting what is meant by 'actions and proceedings.'" 706 F.3d at 329–30; *see also* Dis. Op. at 40–41. Again, we respectfully disagree. The waiver of the right to jury in the forum selection clauses "merely states the obvious, that certain 'actions and proceedings' would allow for jury trials, and then clarifies that the jury right is forfeited in those instances." *Golden Empire*, 922 F. Supp. 2d at 442. The forum selection clauses thus commit the parties to federal court, where they consent to a bench trial.

Fifth, both Reno and the dissent argue that if there is a reading of the forum selection clauses that permits Goldman's default obligation to arbitrate under the FINRA Rules to remain in effect, we must choose that reading. Dis. Op. at 34. And indeed, such a reading is available here. Arbitration awards are not self-enforceable. Accordingly, we could require Goldman to arbitrate at Reno's request and then require Reno to enforce the arbitration award, if any, in the District of Nevada, thereby harmonizing Goldman's default obligation to arbitrate with the forum selection clauses. The flaw in this argument is that it erroneously assumes that the presumption in favor of arbitrability applies. Where the

presumption applies, we compel arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Techs., Inc.*, 475 U.S. at 650 (internal quotation marks and citation omitted). Where, as here, the presumption does not apply, however, we use general state-law principles of contract interpretation to effectuate the intent of the parties. As a result, the mere availability of an alternative reading of the forum selection clauses is beside the point.

In light of the foregoing, we will give full effect to the all-inclusive breadth of the forum selection clauses ("all actions and proceedings"), their mandatory nature ("shall"), and their reference to a judicial forum ("the United States District Court for the District of Nevada"). We therefore conclude that the forum selection clauses superseded Goldman's default obligation to arbitrate under the FINRA Rules and that, by agreeing to these clauses, Reno disclaimed any right it might otherwise have had to the FINRA arbitration forum.

Lastly, Reno contends that, even if the forum selection clauses in the 2005 and 2006 Broker-Dealer Agreements require that Reno bring claims arising out of those agreements in the District of Nevada, Reno's claims arising solely out of the 2005 and 2006 Underwriter Agreements—which do not contain a forum selection clause—may still proceed in FINRA arbitration. Reno is mistaken on this point, too.

The 2005 and 2006 Broker-Dealer Agreements contain broad merger clauses referencing "the other agreements and instruments executed and delivered in connection with the issuance of the ARS" and stipulating that the Broker-Dealer

Agreements "contain the entire agreement between the parties relating to the subject matter hereof." The "other agreements and instruments executed and delivered in connection with the issuance of the ARS" certainly include the 2005 and 2006 Underwriter Agreements. As a result, the forum selection clauses also encompass claims arising out of those agreements.

Moreover, as the Statement of Claim reveals, all of Reno's claims are inextricably linked to the 2005 and 2006 Broker-Dealer Agreements. The core of Reno's claims is that, when negotiating with Reno to become both underwriter and broker-dealer for the 2005 and 2006 Bonds, Goldman did not disclose its general practice of placing support bids to prevent ARS auctions from failing. Reno asserts that "[h]ad [it] known that [its ARS] would be wholly-dependent on Goldman's continued support bidding practice . . . , Reno would never have taken the risk . . . . Instead, Reno could have chosen an alternative structure for the financing." As damages, Reno seeks, inter alia, "disgorgement of all fees and costs associated with issuing the ARS [and] conducting the auctions," i.e., both underwriter and broker-dealer fees. Accordingly, all of Reno's claims arise, at least in part, out of the 2005 and 2006 Broker-Dealer Agreements and are therefore subject to the forum selection clauses that limit jurisdiction to the District of Nevada.

## IV. CONCLUSION

We conclude that we, rather than FINRA, must determine the arbitrability of this dispute. Although we agree with the district court that Reno qualifies as Goldman's customer under FINRA Rule 12200, we hold that Reno disclaimed its right to FINRA arbitration by agreeing to the forum selection

clauses in the 2005 and 2006 Broker-Dealer Agreements. Consequently, we reverse the district court's order and final judgment. And despite Goldman's "overwhelming likelihood of success on the merits," we remand this case to the district court to consider the remaining *Winter* factors consistent with this opinion. *Evans v. Shoshone-Bannock Land Use Policy Comm'n*, 736 F.3d 1298, 1307 (9th Cir. 2013) (noting that "a preliminary injunction is an extraordinary remedy never awarded as of right" and that "the grant of a preliminary injunction is a matter committed to the discretion of the trial judge" (internal quotation marks, citations, and alterations omitted)).

**REVERSED and REMANDED.**

BATTAGLIA, District Judge, concurring in part and dissenting in part:

I concur with Parts III-A and III-B of the Majority's opinion.

I concur that the district court erroneously concluded that Goldman, Sachs & Co. ("Goldman"), as a member of the Financial Industry Regulatory Authority ("FINRA"), agreed to FINRA arbitration on the issue of arbitrability itself. Rather, courts should decide where an agreement does not provide "clear and unmistakable" evidence that the parties intended FINRA would determine the issue of arbitrability. Thus, the district court erred in delegating this matter to FINRA.

I also concur with the Majority's conclusion that a "customer" is a non-broker and non-dealer who purchases commodities or services from a FINRA member in the course of the member's FINRA-regulated business activities. The City of Reno ("Reno"), therefore, falls within this definition of "customer" under both the 2005 and 2006 Underwriter and Broker-Dealer Agreements.

Finally, I concur with the Majority's finding that parties can supersede, displace, or waive FINRA's arbitration requirement through a subsequent agreement and that an express waiver of arbitration is unnecessary. The Majority's adoption of the Fourth Circuit's "sufficiently specific" test was appropriate for determining if, in fact, the parties superseded, displaced, or waived the arbitration obligation created by FINRA Rule 12200 through the 2005 and 2006 Broker-Dealer Agreements. However, it is here that I diverge from my colleagues and respectfully dissent from the finding that the contracting parties' forum selection clauses superseded Goldman's pre-existing obligation to arbitrate under the FINRA Rules. For the following reasons, I would affirm the district court's finding that: "[t]he exclusive forum selection clauses in the Broker-Dealer Agreements do not touch upon arbitration or arbitrability directly, but rather only control the forum of a court action apart from, or in review of, arbitration." *Goldman, Sachs & Co. v. City of Reno*, No. 3:12-CV-00327, 2012 WL 5944966, at \*4 (D. Nev. Nov. 26, 2012). As a result, I would affirm the district court's denial of Goldman's motion to preliminarily enjoin the FINRA arbitration.

In *UBS Financial Services, Inc. v. Carilion Clinic*, the Fourth Circuit held that contracting parties may avoid FINRA arbitration by executing a subsequent agreement that is

"*sufficiently specific* to impute to the contracting parties the reasonable expectation that they are superseding, displacing, or waiving the arbitration obligation created by FINRA Rule 12200." 706 F.3d 319, 328 (4th Cir. 2013) (emphasis added). As an issue of first impression for the Ninth Circuit, I agree that adoption of this approach is appropriate. This is preferable to a narrower express waiver requirement.[1] However, as stated above, under the facts of the instant case, I do not find the forum selection clauses at issue to have sufficiently demonstrated the parties' intent to supersede, displace, or waive arbitration.

I disagree with two aspects of the Majority's analysis. First, I disagree with the Majority's heavy reliance on the opinion of the Honorable Richard J. Sullivan in *Goldman, Sachs & Co. v. Golden Empire Schools Financial Authority*, 922 F. Supp. 2d 435 (S.D.N.Y. 2013). Instead, the Fourth Circuit's *Carilion Clinic* is more persuasive. Second, I do not agree with the Majority's conclusion that the phrase "all actions and proceedings," in the forum selection clauses of the 2005 and 2006 Broker-Dealer Agreements, is "sufficiently specific" to impute to the contracting parties the reasonable expectation that they are superseding, displacing, or waiving the arbitration obligation under FINRA Rule 12200.

---

[1] Similarly, the Second Circuit will find FINRA arbitration waived where contracting parties execute a "subsequent agreement the terms of which plainly preclude arbitration," but will enforce arbitration if the contractual provision can possibly be read as complementary to FINRA's arbitration requirement. *Applied Energetics, Inc. v. NewOak Capital Mkts, LLC*, 645 F.3d 522, 525 (2d Cir. 2011) (citing *Bank Julius Baer & Co. v. Waxfield Ltd.*, 424 F.3d 278, 281 (2d Cir. 2005)).

Founded in 2007, FINRA is a self-regulatory organization established under Section 15A of the Securities Exchange Act of 1934[2] and has the authority to exercise comprehensive oversight over "all securities firms that do business with the public." *Sacks v. SEC*, 648 F.3d 945, 948 (9th Cir. 2011) (quoting 72 Fed. Reg. 42170 (Aug. 1, 2007)). FINRA membership constitutes an agreement to "adhere to FINRA's rules and regulations, including its Code and relevant arbitration provisions contained therein." *UBS Fin. Serv*s., *Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 648–49 (2d Cir. 2011). By becoming a member of FINRA, Goldman agreed to submit to FINRA rules, including Rule 12200, which requires members to arbitrate disputes in connection with their business activities if and when arbitration is requested by a customer or required by a written agreement. *See* FINRA Rule 12200; *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 32 n.1 (2d Cir. 2010).

Therefore, although a written arbitration agreement between Goldman and Reno does not exist, "FINRA rules may establish the requisite arbitration agreement." *See J.P Morgan Sec. Inc. v. La. Citizens Prop. Ins. Corp.*, 712 F. Supp. 2d 70, 76–77 (S.D.N.Y. 2010). Moreover, FINRA Rule 12200 constitutes an agreement in writing under the Federal Arbitration Act ("FAA") and Reno is entitled to invoke FINRA Rule 12200 as an intended third-party beneficiary.

---

[2] 15 U.S.C. § 78o–3; *Karsner v. Lothian*, 532 F.3d 876, 879 n. 1 (D.C. Cir. 2008); SEC Release No. 34–56145 (July 26, 2007).

*See Kidder, Peabody & Co. v. Zinsmeyer Trusts P'ship*, 41 F.3d 861, 863–64 (2d Cir. 1994).**[3]**

While this existing obligation to arbitrate under FINRA Rule 12200 exists, Goldman and Reno are nevertheless free to supersede, displace, or waive arbitration with a subsequent agreement that is "sufficiently specific." However, even without applying the presumption in favor of arbitration, and instead using general state principles of contract interpretation, the contract language in the forum selection clauses is not "sufficiently specific" to impute to the contracting parties the reasonable expectation they are superseding, displacing, or waiving the arbitration obligation created by FINRA Rule 12200. *Carilion Clinic*, 706 F.3d at 328.

In applying the standard set by *Carilion Clinic*, the Majority relies heavily on an opinion from the Southern District of New York, agreeing with the New York district court that the phrase "all actions and proceedings" encompasses arbitration. *See Golden Empire*, 922 F. Supp. 2d at 443. In my view, this reliance is misplaced for two reasons. First, *Golden Empire* failed to adhere to Second Circuit precedent directing its courts to enforce an arbitration where a forum selection clause and an agreement to arbitrate may be read as complementary. *See Bank Julius Baer & Co. v. Waxfield Ltd.*, 424 F.3d 278, 284 (2d Cir. 2005) ("Under our cases, if there is a reading of the various agreements that permits the Arbitration Clause to remain in effect, we must chose it . . . ."). Second, *Golden Empire* failed to

---

**[3]** Though not addressing FINRA rules themselves, *Kidder* considered the rules and regulations of the National Association of Securities Dealers, Inc. ("NASD"), the predecessor of FINRA.

acknowledge the distinction between the phrase "any dispute" as featured in *Applied Energetics* and the phrase "all actions and proceedings" in the agreements presented to the district court. *Golden Empire*, 922 F. Supp. 2d at 443 (citing *Applied Energetics Inc. v. NewOak Capital Mkts., LLC*, 645 F.3d 522, 525 (2011)). This led the New York district court to mischaracterize the agreements as being "all-inclusive, . . . mandatory, and neither admits the possibility of the other." *Id.*

In *Bank Julius*, the Second Circuit determined that the existence of a broad arbitration agreement creates a "presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." 424 F. 3d at 284. The parties in *Bank Julius*, initially agreed to arbitrate "any . . . dispute" arising out of their contractual relationship then subsequently entered into an agreement omitting any mention of arbitration. *Id.* at 282. The subsequent agreement, however, contained a forum selection clause stating that "any Action" brought by the defendant must be in any New York State or Federal Court sitting in New York City. *Id.* Furthermore, the subsequent agreement contained a merger clause providing that "[t]his Agreement supersedes all prior agreements and understanding between [the parties]" but also provided that "the rights and remedies provided [herein] are cumulative and not exclusive of any rights or remedies provided under any other agreement or by law or in equity." *Id.*

Under these circumstances, the Second Circuit concluded that the forum selection clause in the subsequent agreement could be read as complementary with an initial agreement to arbitrate. *Id.* at 284. The court noted that a subsequent

agreement, such as one containing a forum selection clause and a merger clause, could not nullify an arbitration agreement unless that subsequent contract "specifically precludes arbitration." *Id.* at 284 (citing *Personal Sec. & Safety Sys. v. Motorola*, 297 F.3d 388, 396 n.11 (5th Cir. 2002)). In analyzing the forum selection clause, the *Bank Julius* court concluded that "we cannot say that the Forum Selection Clause, which does not even mention arbitration, either 'specifically precludes' arbitration or contains a 'positive assurance' that this dispute is not governed by the Arbitration Agreement." *Id.* The court found that there is "nothing inconsistent between the arbitration obligation and the instant forum selection clause. Both can be given effect . . . ." *Id.*

Thus, "where a Forum Selection Clause can be understood . . . as complementary to an agreement to arbitrate," a court should enforce the arbitration agreement. *Id.* Additionally, because the forum selection clause made no reference to arbitration, the Second Circuit in *Bank Julius* found it to be "at least ambiguous" which requires resolution "in favor of coverage." *Id.* at 285 (internal quotations omitted) (citing *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d. Cir. 1997)). *Golden Empire* did not adhere to this Second Circuit directive and ignored the natural integration of the role and control of the forum court action, apart from, or in review of, arbitration agreements. Under the facts of *Golden Empire*, as well as in the instant case, the forum selection clause requiring the parties to submit to the jurisdiction of the district court for the District of Nevada "all actions and proceedings" may be read as complementary to FINRA Rule 12200 in that the parties may seek court enforcement of arbitral awards or challenge the validity or application of the arbitration agreement in court.

Of further concern is *Golden Empire's* failure to recognize the distinction between the phrases "all actions and proceedings" and "any dispute." In *Bank Julius*, the parties first agreed to arbitrate "any . . . dispute" arising out of their contractual relationship but subsequently executed an agreement in which the defendant agreed to submit "any Action" to a New York state or federal court, creating two complementary and enforceable agreements.[4] This subtle, but significant, difference in language was recognized by the Second Circuit in *Applied Energetics, Inc. v. NewOak Capital Markets*, and was used to distinguish the two agreements presented to the *Applied* court. 645 F.3d at 525–26.

In *Applied Energetics*, the parties entered into two agreements during the course of their transaction. The first, the Engagement Agreement, contained an arbitration clause stating, "[e]ach of NewOak and Applied agrees that *any dispute* arising out of or relating to this letter, the Indemnity Agreement and/or the transactions contemplated hereby or thereby . . . shall be resolved through binding arbitration . . . ." *Id.* at 523 (emphasis added). The second, the Placement Agreement, contained a clause providing that "*[a]ny dispute* arising out of this Agreement shall be adjudicated in the Supreme Court, New York County or in the federal district court for the Southern District of New York." *Id.* (emphasis added). Because the two agreements used the same phrase "any dispute," with one requiring arbitration and the other providing for adjudication in a judicial forum, the *Applied* Court found the case fell within the scenario contemplated by *Bank Julius*, "where contracting parties are free to revoke an

---

[4] Similarly, the parties in *Golden Empire* were obligated to arbitrate "a dispute" under FINRA Rule 12200 should Golden Empire, as a customer, so request.

earlier agreement to arbitrate by executing a subsequent agreement the terms of which plainly preclude arbitration." *Id.* at 525. The two provisions at issue in *Applied Energetics* used parallel language; as a result, the Second Circuit concluded both provisions were "all-inclusive, both mandatory, and neither admits the possibility of the other." *Id.*

Thus the Second Circuit in *Applied Energetics* found the subsequent Placement Agreement specifically precluded arbitration. *Id.* In arriving at this conclusion, the Second Circuit considered two factors equally worthy of analysis here. First, the *Applied* Court noted that the Engagement Agreement and the Placement Agreement used "parallel language" that stood in "direct conflict" with each other. *Id.* As stated above, the two Agreements were all-inclusive, mandatory, and neither admitted the possibility of the other, thereby making it abundantly apparent that the subsequent agreement completely displaced the first. *Id.* Second, the Placement Agreement used the term "adjudicate" as a clear and unmistakable reference to judicial action. *Id.* Accordingly, the subsequent Placement Agreement, which completely supplanted the Engagement Agreement, exclusively contemplated judicial proceedings to resolve the parties' dispute. These two factors were a part of the basis for the Second Circuit's conclusion. However, these two factors did not exist in *Golden Empire*, nor do they exist in the instant matter, and the court in *Golden Empire* failed to recognize these important distinctions.

Accordingly, I disagree with *Golden Empire's* conclusion that FINRA Rule 12200 and the Broker-Dealer Agreements' forum selection clauses were "all inclusive, . . . mandatory, and neither admits the possibility of the other." *Golden*

*Empire*, 922 F. Supp. 2d at 443 (ellipsis in original). Indeed, the contract language at issue in *Golden Empire*, and substantially the same language at issue here, is more akin to that found in *Bank Julius*. 424 F.3d at 282. FINRA Rule 12200 provides that a "dispute" must be arbitrated if the customer so requests or is required by writing, whereas the Broker-Dealer Agreements' forum selection clauses provide that "all actions and proceedings" must be brought in a judicial forum. Enforcement of both is possible as the two provisions may be read as complementary. Next, the *Golden Empire* court, and the Majority here, concluded that FINRA Rule 12200 and the forum selection clause are both mandatory and neither admits the possibility of the other; I respectfully disagree. Despite the use of the obligatory verb "must" in FINRA Rule 12200, the duty to arbitrate is only triggered when one of two conditions are met, if indeed they are ever met. Yet the court in *Golden Empire* failed to recognize that the duty to arbitrate may never be triggered if a written agreement does not provide for it or if the customer does not request it. If neither conditions occurs, the parties may proceed in a judicial forum without any obligation to arbitrate. Thus, *Golden Empire's* characterization of FINRA Rule 12200 and the forum selection clause as all-inclusive, mandatory, and mutually exclusive was incorrect.

Moreover, the forum selection clauses contained within the 2005 and 2006 Broker-Dealer Agreements are not sufficiently specific to impute the reasonable expectation that they were intended to supersede, displace, or waive the arbitration obligation created by FINRA Rule 12200. The Fourth Circuit reached the same conclusion in *Carilion Clinic* when analyzing the language of a forum selection clause nearly identical to the forum selection clauses at issue here. 706 F.3d at 329. The forum selection clause in *Carilion*

*Clinic* provided that "all actions and proceedings shall be brought in the United States District Court in the County of New York," then expressly waived the parties' right to trial by jury. *Id.* The Fourth Circuit provided a thorough and well-reasoned analysis of the adequacy of the forum selection clause and concluded the clause failed to meet the "sufficiently specific" standard as it made no suggestion of the parties' intent to supersede, displace, or waive the right to FINRA arbitration. *Id.* at 330. The Majority here dismisses the Fourth Circuit's reasoning and instead fully adopts the analysis set forth in *Golden Empire*.

As a result, the Majority agrees with *Golden Empire* and finds that there is no evidence the parties intended the phrase "actions and proceedings" to have a technical meaning limited to only those actions and proceedings that may be brought in a judicial forum. It is unsurprising that many courts and even FINRA have referred to arbitration as a "proceeding." It is undeniable that arbitration is referred to as an "action" or a "proceeding" in common parlance. Indeed, there are only so many ways we can refer to a course of events or action. While the Majority references to a number of sources that refer to arbitration as an "action" or a "proceeding," it is also possible to find sources limiting "actions and proceedings" to those brought in a judicial forum.

For instance, an "action" in the legal sense is defined as "[a] civil or criminal judicial proceeding."[5] Black's Law

---

[5] This broad definition is supported by the following reason:

> An action has been defined to be an ordinary proceeding in a court of justice, by which one party

Dictionary 31 (8th ed. 2004); *see also* Black's Law Dictionary 28 (6th ed. 1990) ("A lawsuit brought in a court, a formal complaint within the jurisdiction of a court of law . . . that includes all the formal proceedings in a court of justice . . . ."). The phrase "all actions and proceedings" also appears in Rule 1 of the Federal Rules of Civil Procedure, which governs civil actions and proceedings in the United States district courts. Fed. R. Civ. P. 1. Rule 1 explicitly refers to actions and proceedings as those brought in a judicial forum, from which arbitrations are precluded. Section 3 of the Federal Arbitration Act ("FAA") allows parties with a valid arbitration agreement to apply for a stay in "any suit or proceeding" that has been brought into any of the *courts of the United States*. 9 U.S.C § 3 (emphasis added). Here, the FAA undoubtedly refers to "proceedings" as meaning those proceedings brought in a judicial forum; consequently, "proceedings" under the language of the FAA does not encompass arbitration.

In light of the above ambiguities, it is obvious why the parties have sought judicial resolution on the issue of whether the forum selection clause superseded, displaced, or waived the arbitration requirement under FINRA. While not

---

prosecutes another party for the enforcement or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense . . . . More accurately, it is defined to be any judicial proceeding, which, if conducted to a determination, will result in a judgment or decree. The action is said to terminate at judgment.

Black's Law Dictionary 31 (8th ed. 2004) (quoting 1 Morris M. Estee, Estee's Pleadings, Practice, and Forms § 3, at 1 (Carter P. Pomeroy ed., 3d ed. 1885)).

dispositive, it is important to be mindful of the sophistication of the parties involved, both undoubtedly represented by skilled counsel in negotiating, forming, and executing the Agreements at issue in an arm-length transaction. While it may be that it is "common parlance" to refer to arbitrations as an action or a proceeding, it is equally reasonable to conclude that the parties intended the phrase to denote its technical and legal meaning that excludes arbitration. With two reasonable interpretations possible, we must look to the contract itself to determine the parties' intent.

"In interpreting a contract, 'the document must be read as a whole to determine the parties' purpose and intent, giving a practical interpretation to the language employed so that the parties' reasonable expectations are realized.'" *Queens Best, LLC v. Brazal S. Holdings, LLC*, 35 A.D.3d 695, 696–97 (N.Y. App. Div. 2006) (quoting *Snug Harbor Square Venture v. Never Home Laundry, Inc.*, 252 A.D.2d 520, 521 (N.Y. App. Div. 1998)); *see also Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324–25 (N.Y. 2007) ("Further, a contract should be read as a whole and every part will be interpreted with reference to the whole and if possible it will be so interpreted as to give effect to its general purpose." (internal quotation marks and citation omitted)).[6] After the initial language regarding the District of Nevada as the forum for all actions and proceedings, the forum selection clause goes on to state "[e]ach of the parties hereto also irrevocably waives all right to trial by jury in any action, proceeding or counterclaim arising out of this Broker-Dealer Agreement or the transactions contemplated hereby." Therefore, simply

---

[6] Section 5.09 of the 2005 and 2006 Broker-Dealer Agreements provides that this "Agreement shall be governed by and construed in accordance with the laws of the State of New York . . . ."

referencing this next sentence suggests that the phrase "all actions and proceedings" refers to only those brought in a judicial forum, the only forum in which a jury may sit. *See Carilion Clinic*, 706 F.3d at 329–30 ("The more reasonable construction would take the references to 'court' and 'jury trials' as limiting what is meant by 'actions and proceedings.' Thus read in the context of courts and jury trials, the terms 'actions and proceedings' would be understood as a term of art . . . .").

Furthermore, if contract clauses appear to be repugnant to each other, the court should interpret the contract "in a way which reconciles all its provisions, if possible." *Green Harbour Homeowners' Assn., Inc. v. G.H. Dev. & Constr., Inc.*, 14 A.D.3d 963, 965 (N.Y. App. Div. 2005). Here, although we are dealing with the specific phrase "actions and proceedings" within a forum selection clause, the same principles of contract interpretation are relevant. If "actions and proceedings" includes arbitration, then the provision suggests arbitration remains available but must be brought in court. Such a reading renders the entire sentence contradictory as arbitrations may not be pursued in courts as a general rule. The Fourth Circuit arrived at this same conclusion, noting the "problems inherent in this logical construct." *Carilion Clinic*, 706 F.3d at 329. To reconcile the entire sentence, "all actions and proceedings" must be read to mean only judicial actions and proceedings. Moreover, we should not read a contract in a way that would render any portion meaningless. *CNR Healthcare Network, Inc. v. 86 Lefferts Corp.*, 59 A.D.3d 486, 489 (N.Y. App. Div. 2009). Again, the suggestion that "actions and proceedings" includes arbitration results in a nonsensical reading of the remaining portion of the forum selection clause as the language suggests arbitration should be brought in a judicial forum with the

parties waiving all rights to a trial by jury in the "action" or "proceeding." *See Carilion Clinic*, 706 F.3d at 329. As an arbitration may not be brought in a judicial forum and arbitration does not include a right to a jury trial, an interpretation of "actions and proceedings" as including arbitration results in an illogical reading of the entire provision.

With these considerations in mind, I would agree with the Fourth Circuit in *Carilion Clinic* that "it would never cross a reader's mind that the [forum selection] clause provides that the right to FINRA arbitration was being superseded or waived." *Id.* at 330. Given the broad right a customer has to seek arbitration under FINRA Rule 12200, the forum selection clauses in the Broker-Dealer Agreements falls far short of providing "sufficiently specific" language to impute to the contracting parties the reasonable expectation that FINRA's arbitration requirement has been superseded, displaced, or waived. Accordingly, I would affirm the district court's denial of Goldman's motion for preliminary injunction.